**FOR SERVICE ABROAD OF JUDICIAL OR EXTRA JUDICIAL DOCUMENTS**

*DEMANDE*
*AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ETRANGER*
*D'UN ACTE JUDICIARE OU EXTRAJUDICIAIRE*

Convention on the service abroad of judicial and extrajudicial documents in civil or
commercial matters, signed at The Hague, November 15, 1965

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile*
*ou commerciale, signée à La Hage, le 15 Novembre 1965.*

14-SXS-650

| Identity and address of the applicant<br>*Indentité et adresse du requérant* | Address of receiving authority<br>*Adrese de l'autorité destinataire* |
|---|---|
| L. Celeste Ingalls**<br>Crowe Foreign Services<br>1020 SW Taylor Street, Suite 240<br>Portland, Oregon 97205<br>USA<br>Email: Lci@foreignservices.com<br>Fax Number: 1 503 222 3950 | Department of International Judicial Assistance<br>Ministry of Justice of P.R.O.C.<br>6, Chaoyangmen Nandajie<br>Chaoyang District<br>Beijing 100020, P.R.O.C.<br><br>Phone: 8610-6520 6239   Fax: 8610-6594 1991 |

The undersigned applicant has the honour to transmit - in duplicate - the documents listed below and, in conformity with article 5 of the
above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.,
(identity and address)
*Le requérant soussigné a l'honneur de faire parvenir - en double exemplaire - a l'autorité destinataire les documents ci-dessous énumérés*
*en la priant conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, savior:*
*(identité et adresse)*

**ZTE Corporation**
**ZTE Plaza, Keji Road South, Hi-tech Industrial Park, Nanshan District**
**Shenzhen 518057**

☒ (a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention.*
    *a)  selon les formes légales (article 5, alinéa premier, lettre a).*

☐ ~~(b) in accordance with the following particular method (sub-paragraph (b) of the first paragraph of article 5)*:~~
    ~~*b)  selon la forme particulière suivante (article 5, alinéa premier, lettre b):*~~

☐ ~~(c) by delivery to the addressee, if he accepts it voluntarily (second paragraph of article 5)*.~~
    ~~*c)  le cas échéant, par remise simple (article 5, alinéa 2).*~~

The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes* - with a certificate
as provided on the reverse side.
*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes - avec l'attestation figurant*
*au verso.*

**List of documents**
*Enumération des pieces*

Executed "Summary" (2 pages)
***Summons in a Civil Action
***First Amended Complaint
***Exhibits
Case No. 4:12-CV-01166 TIA

Done at Portland, Oregon, USA, the 18ᵗʰ day of May , 2014.
*Fait à Portland, Oregon, USA, le...*

Signature and/or stamp.
*Signature et/ou cachet*

OFFICIAL STAMP
LYLE CELESTE INGALLS
NOTARY PUBLIC-OREGON
COMMISSION NO. 925256
MY COMMISSION EXPIRES FEBRUARY 13, 2018

L. Céleste Ingalls

* Delete if inappropriate
*Rayer les mentions inutiles*

** Authorized applicant pursuant to Rule 4(c)(2) of the
Federal Rules of Civil Procedure, Public Law 97-462 462
*** With Chinese translation PROVIDED BY PLAINTIFF COUNSEL



Exhibit A

# 证明书
## CERTIFICATE
### *ATTESTATION*

根据公约第六条，签署本证明书的机关荣幸地证明，
The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

☐  **1. 文书已予送达\***
that the document has been served *
*que la demande a été exécutée\**

| — 日期：<br>the (date) / le (date) : | _____ |
| — 地点（城镇、街、号）：<br>at (place, street, number) / à (localité, rue, numéro) : | _____ |

| — 采用的第五条所规定的送达方法为：<br>in one of the following methods authorised by Article 5:<br>*dans une des formes suivantes prévues à l'article 5 :* | |
|---|---|
| ☐ | a) 依公约第五条第一款第（一）项的规定。\*<br>in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention*<br>*selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ☐ | b) 依下述特定方法\*<br>in accordance with the following particular method*:<br>*selon la forme particulière suivante* :<br>_____ |
| ☐ | c) 交付给自愿接受的收件人。\*<br>by delivery to the addressee, if he accepts voluntarily*<br>*par remise simple\** |

请求书中所列文书已交付给：
The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à :*

| 收件人身份和说明：<br>Identity and description of person:<br>*Identité et qualité de la personne :* | _____ |
| 与受送达人的关系（家庭、业务及其他）：<br>Relationship to the addressee (family, business or other):<br>*Liens de parenté, de subordination ou autres, avec le destinataire de l'acte :* | _____ |

☐  **2. 由于下列事实文书未能送达：\***
that the document has not been served, by reason of the following facts*:
*que la demande n'a pas été exécutée, en raison des faits suivants\* :*

| _____ |
|---|

☐  按照公约第十二条第二款，请申请者支付或补偿后附说明中开列的费用。\*
In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.
*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.*

*附：*
*Annexes / Annexes*

| 退还的文书：<br>Documents returned:<br>*Pièces renvoyées :* | _____ |
| 适当时，确认送达的文书：<br>In appropriate cases, documents establishing the service:<br>*Le cas échéant, les documents justificatifs de l'exécution :* | _____ |

\*适当时
*il appropriate / s'il y a lieu*

| 制于（地点）_____<br>Done at / Fait à<br><br>日期_____<br>the / le | 签名和（或）盖章<br>Signature and/or stamp / Signature et / ou cachet |

## SUMMARY OF THE DOCUMENT TO BE SERVED
*ELEMENTS ESSENTIELS DE L'ACTE*

Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965

*Convention relative à la signification et à la notification à l'étranger des actes judiciaries et extrajudiciares en matière civile ou commerciale, signée à La Hage, le 15 Novembre 1965.*

(article 5, fourth paragraph)
*(article 5, alinéa 4)*

| | |
|---|---|
| **Name and address of the requesting authority:** | **L. Celeste Ingalls** |
| *Nom et adresse de l'autorité requérante:* | **Crowe Foreign Services** |
| | **1020 SW Taylor Street, Suite 240** |
| | **Portland, Oregon, USA 97205** |

| | |
|---|---|
| **Particulars of the parties*:** | **Daredevil, Inc.** .................................................................................... **PLAINTIFF** |
| *Indentité des parties:* | **ZTE Corporation** ...................................................................................**DEFENDANT** |

Case No. 4:12-CV-01166 TIA

## JUDICIAL DOCUMENT**
*ACTE JUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:*    **To give notice to defendant, ZTE Corporation, of institution against it of a claim for damages and to summon it to answer the claim.**

**Nature and purpose of the proceedings, and, where appropriate, the amount in dispute:**
*Nature et objet de l' instance, le cas échéant, le montant du litige:*

**Civil claim alleging breach of contract and related actions. Plaintiff's claims include, but are not limited to, allegations that the Defendant breached their contract for failing to deliver the Missouri Equipment in question, causing plaintiff to suffer damages. Plaintiff seeks judgment for damages in an amount to be determined including, but not limited to, interest, costs of suit, and such other and further relief as the court deems just and proper.**

| | |
|---|---|
| **Date and place for entering appearance**:** | **N/A** |
| *Date et lieu de la comparution:* | |
| **Court which has given judgment**:** | **N/A** |
| *Juridiction qui a rendu la décision:* | |
| **Date of judgment**:** | **N/A** |
| *Date de la décision:* | |

**Time limits stated in the document**:**
*Indication des délias figurant dans l'acte:*    **Defendant is required to serve an ANSWER upon Plaintiff's attorney and file same ANSWER with the Court within twenty-one (21) days after receipt of the Summons in a Civil Action and other documents herein.**

## EXTRAJUDICIAL DOCUMENT*
*ACTE EXTRAJUDICIAIRE*

| | |
|---|---|
| **Nature and purpose of the document:** | **N/A** |
| *Nature et objet de l'acte:* | |
| **Time limits stated in the document**:** | **N/A** |
| *Indication des délias figurant dans l'acte:* | |

* If appropriate, identity and address of the person interested in the transmission of the document.
*S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte.*

** Delete if inappropriate.
*Rayer les mentions inutiles.*

待送达文书之摘要
共 2 页之第 2 页
**SUMMARY OF THE DOCUMENT TO BE SERVED**
**PAGE 2 OF 2**

*1965 年 11 月 15 日签署于海牙的*

*《民商事司法文书与司法外文书域外送达公约》*

*(第 5 条，第四段)*

*Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters,*
*signed at The Hague, the 15th of November 1965*
*(Article 5, fourth paragraph)*

受送达人 l 的身份和地址 --:
*Identity and address of the addressee l --:*

---

**ZTE Corporation**
**ZTE Plaza, Keji Road South, Hi-tech Industrial Park,**
**Nanshan District**
**Shenzhen 518057**

---

Case No. 4:12-CV-01166 TIA

重要事项

所附文书具有法律性质并可能对您的权利和责任产生影响。这份《待送达文书之摘要》将使您了解有关其性质和目的的若干信息。不过，您还是应当仔细阅读文书本身。您也可能需要寻求司法建议。

如果您缺乏足够的经济来源，您就应当寻求在您居住的国家或者签发文书的国家获取法律援助或建议可能性的信息。

关于在签发文书的国家内获取法律援助或建议可能性的问题，可以联络：

Legal Services of Eastern MO, Inc. Saint Louis Volunteer Lawyers' Program
4232 Forest Park Ave
Saint Louis, MO 63108-2811
314-534-4200

**IMPORTANT**

*THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS.   THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE.   YOU SHOULD, HOWEVER, READ THE DOCUMENT ITSELF CAREFULLY.  IT MAY BE NECESSARY TO SEEK LEGAL ADVICE*

*IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT, YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.*

*ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:*

Legal Services of Eastern MO, Inc. Saint Louis Volunteer Lawyers' Program
4232 Forest Park Ave
Saint Louis, MO 63108-2811
314-534-4200

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

| | |
|---|---|
| Daredevil Corporation, Inc. | ) |
| ——————————————— | ) |
| *Plaintiff* | ) |
| v. | ) |
| ZTE Corporation | ) |
| ——————————————— | ) |
| *Defendant* | ) |

Civil Action No.   4:12-CV-01166 TIA

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   ZTE Corporation
ZTE Plaza
Keji Road South
Hi-Tech Industrial Park, Nanshan District
Shenzen PRC 518057

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:       John Grellner
5205 Lindenwood Ave.
St. Louis MO 63109

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____            _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.  4:12-CV-01166 TIA

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                                      *Server's signature*

                                             _____
                                                      *Printed name and title*


                                             _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTER DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| DAREDEVIL, INC., a Missouri corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 4:12-CV-01166 |
| ZTE CORPORATION, a corporation incorporated under the laws of the People's Republic of China, | ) ) ) ) | |
| Defendant. | ) ) | |

### FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiff, Daredevil, Inc. ("Daredevil"), a Missouri corporation, by and through undersigned counsel, states the following for its First Amended Complaint against Defendant ZTE Corporation ("ZTE Corp."), a corporation incorporated under the laws of the People's Republic of China:

### Jurisdiction and Parties

1.     Daredevil is a Missouri corporation in good standing with its principal place of business located in St. Charles County, Missouri.

2.     ZTE Corp. is a corporation incorporated under the laws of the People's Republic of China and, upon information and belief, has transacted business in St. Louis County, Missouri at all times material to this Complaint.

3.     Jurisdiction is proper before the Court pursuant to 28 U.S.C. § 1332.

4.     Venue is proper.

| EXHIBIT |
|---|
| 1 |

DB04/0837856.0003/6497292.2  DD02

## General Allegations

**A.      The Negotiations**

5.       Prior to 2008, Daredevil began working to establish a cellular telephone network in the St. Louis, Missouri metropolitan area ("Missouri Network").

6.       In order to successfully compete in the St. Louis area, it was necessary for Daredevil to develop the Missouri Network by certain deadlines since a competing cellular telecommunications provider was also preparing to enter the St. Louis market at the same time.

7.       In this regard, Daredevil needed to launch[1] its network before the competitor, or at the very least within the same time frame of its competitor's launch.

8.       If Daredevil could not meet the deadlines, it could not compete effectively and launching the Missouri Network would not be profitable.

9.       Initially, Daredevil had not considered using equipment manufactured by ZTE Corp. in connection with its development of the Missouri Network.

10.      Notwithstanding the foregoing, representatives of ZTE Corp. and ZTE USA, Inc. ("ZTE USA"), ZTE Corp.'s wholly owned United States subsidiary (collectively "ZTE"), pursued a relationship with Daredevil in an effort to induce Daredevil to purchase and use equipment manufactured by ZTE Corp.

11.      Two individuals, Neil Kushner ("Kushner") and Joey Jia ("Jia"), were primarily responsible for ZTE Corp. and ZTE USA's efforts in courting Daredevil's business.

12.      In order to induce Daredevil to purchase equipment manufactured by ZTE Corp. for the Missouri Network, Kushner and Jia made affirmative representations regarding ZTE

---

[1] Launching a network refers to the process where a telecommunication carrier's network is offered for retail sale to consumers through sales of telephones and service.

2

Corp.'s ability to deliver equipment in a timely manner and acknowledged ZTE Corp.'s willingness to impose strict financial concessions on ZTE Corp. in favor of Daredevil if ZTE Corp. did not meet certain deadlines.

13.     ZTE Corp. also made several other representations to Daredevil and its affiliates related to access to ZTE Corp. handsets and other devices, establishing a joint venture to develop software to allow Daredevil and its affiliates to create applications that would result in competitive differentiation and to benefit from future sales of those applications, using Daredevil's affiliate as a dealer and network developer and installer for future sales of its equipment, and allowing such affiliate to benefit from such future sales accordingly.

**B.     The Missouri Agreement**

14.     As such, on or about September 25, 2008, after a series of negotiations, Daredevil, on the one hand, and ZTE Corp. and ZTE USA, on the other, executed an agreement specifying certain terms governing the purchase of equipment and cooperation between the parties ("Missouri Agreement").  A true and correct copy of the Missouri Agreement is attached hereto as Exhibit "A."

15.     The Missouri Agreement expressly states that "ZTE will cooperate in whatever reasonable manner for the purpose of establishing a close team working environment that transcends the borders dividing the countries of these two companies."

16.     According to the terms of the Missouri Agreement, Daredevil and ZTE Corp. agreed that the St. Louis network would include 179 base stations to be configured with a minimum of one voice and one EVDO Rev A carrier and 30 base stations without heat exchanges for indoor use ("Missouri Equipment").

3

17.     Pursuant to the Missouri Agreement, Daredevil agreed to pay ZTE Corp. a down payment of $2,600,000.  The parties further agreed that Daredevil would (a) pay ZTE Corp. an additional $3,000,000.00 in quarterly installments, commencing after the quarter in which Daredevil's network exceeded 30,000 subscribers, and (b) be required to purchase additional base stations from ZTE Corp. at a predetermined price.  The parties referred to the $3,000,000.00 payment and additional purchase requirements as the "pay as you grow" provision.

18.     ZTE Corp. agreed to deliver the Missouri Equipment to St. Louis according to the following schedule:

        a.      10/30/08 – 179 distribution cable bundles; all mounting hardware and brackets; plints or plenums for 15 sites;

        b.      11/15/08 – remainder of distribution cable bundles; battery cabinets for all sites; mounting hardware and brackets for wall/pole mounting; remaining core network components;

        c.      1/5/2009 – the first 20 base stations, including 6 sector base stations; and

        d.      1/31/2009 – the remaining 159 base stations.

19.     ZTE Corp. further agreed to certain additional provisions benefitting Daredevil and its affiliates, including the following:

        a.      New Products Agreement – ZTE Corp. agreed to "make sure [Daredevil had] access to all the new products ZTE develops . . . including Petmobility, Amberwatch, a CDMA/WIFI phone with ability to track WIFI usage and Internet on airlines . . ." ("New Products Agreement");

        b.      The Dealer Agreement – it was contemplated that after successful deployment of the Missouri Network, ZTE Corp. would "use Daredevil personel (sic) as

4

part of its new business development team and compensate Daredevil for their efforts in accordance with Industry norms."  Further, if Daredevil was "the primary party securing new business for ZTE, Daredevil will be entitled in, (sic) addition to fair compensation for its efforts, to 5% of the sales contracted . . . " ("Dealer Agreement");

     c.    The Development and Installation Agreement – it was contemplated that Daredevil would develop and install the Missouri Network, with support from ZTE Corp. If Daredevil was successful, it was contemplated that "ZTE will give Daredevil the right . . . to perform similar functions on other business they sell and to be compensated for doing so . . ." ("Development and Installation Agreement");

     d.    Handset Supplier Agreement – ZTE Corp. agreed to be Daredevil's "primary supplier of handsets" to the operations of . . . Daredevil and NTCH [an affiliated company], including Flat Wireless in Texas."  ZTE Corp. agreed that it would "match the cost of any other handsets being sold and available to the parties based on comparable features . . . ."  Further, the agreement provided specific pricing for both the C78 and C79 model manufactured by ZTE Corp. ("Handset Supplier Agreement");

     e.    EVDO Device Supplier Agreement – ZTE Corp. agreed to sell Daredevil "EVDO data cards . . . at a cost [of] no more than 1 cent above that sold to other carriers, or less and not to exceed $100." ("EVDO Device Supplier Agreement").

     f.    Applications and Software Development Joint Venture – ZTE Corp. agreed that "the applications and any software developed by Daredevil or its affiliates pursuant to this agreement, if successfully deployed in the Saint Louis area will be promoted to future customers of ZTE."

DB04/0837856.0003/6497292.2  DD02

20.     Finally, ZTE Corp. agreed that "if Daredevil is not satisfied with the cooperative effort exhibited . . . [Daredevil] can escalate meetings with three Chinese based executives of ZTE of successive greater stature to resolve this the last being the most senior officer of ZTE."

21.     ZTE Corp. agreed that Daredevil's initial payment obligations pursuant to the Missouri Agreement were satisfied because ZTE Corp. still owed sums to Daredevil (or parties affiliated with Daredevil) in excess of the initial payment amount.   The final page of the Missouri Agreement is a separately acknowledged one page agreement that recognizes the existence of certain debts owed to certain persons and/or entities affiliated with Daredevil, including Eric Steinmann, PTA-FLA, Inc., and NTCH, Inc.  That same page recognizes that the debts owed were applied toward Daredevil's initial payment obligations pursuant to the Missouri Agreement, and that Daredevil's payment obligations were thereby satisfied.

22.     The last sentence of the Missouri Agreement states "additional terms as included. If there is any conflict [the Missouri Agreement] will take precedence."   The parties also executed a "Master Supply Agreement" ("Missouri MSA") which was intended to supply the additional terms to the Missouri Agreement.   A true and correct copy of the Missouri MSA is attached hereto as Exhibit "B."

**C.     Breach of the Missouri Agreement**

23.     ZTE Corp. failed to timely deliver the Missouri Equipment.

24.     Upon information and belief, shortly before certain deliveries of the Missouri Equipment were due, ZTE Corp. decided that it would deliver those portions of the Missouri Equipment to another customer of ZTE Corp.

25.     ZTE Corp. never delivered the vast majority of Missouri Equipment to Daredevil.

6

26.     Upon information and belief, ZTE Corp. compelled ZTE USA to withhold handsets, and to not participate in any of the joint ventures outlined in the Missouri Agreement.

27.     Due to ZTE Corp.'s failure to deliver the Missouri Equipment to Daredevil, Daredevil lost the opportunity to develop the Missouri Network.

28.     ZTE Corp. did deliver some limited equipment to St. Louis, which equipment Daredevil did install.  However, that equipment became useless when ZTE Corp. failed to timely deliver the remainder of the Missouri Equipment.

29.     Because ZTE Corp. failed to deliver all of the Missouri Equipment, Daredevil was forced to decommission the equipment it had installed in Missouri.

30.     Daredevil incurred significant costs and expenses related to installing and later decommissioning the equipment that ZTE Corp. had delivered.

31.     Daredevil also incurred, and continues to incur, rental expenses on commercial leases that Daredevil entered into to house the Missouri Equipment that was never delivered.

32.     At all times relevant, ZTE Corp. was aware that Daredevil required timely delivery of the Missouri Equipment in order to successfully develop Daredevil's Missouri Network.

33.     Because Daredevil lost the opportunity to develop the Missouri Network, Daredevil suffered damages, including lost profits, in excess of $2,600,000, in addition to losing more than $7,000,000 in development costs related to its efforts in that market.

34.     All conditions precedent to the bringing of this action have occurred, have been satisfied or otherwise have been waived.

DB04/0837856.0003/6497292.2  DD02

## COUNT I
### (BREACH OF THE MISSOURI AGREEMENT)

35.     Daredevil realleges paragraphs 1 through 34 set forth above and incorporates the same herein by this reference.

36.     Daredevil contracted directly with ZTE Corp. in executing the Missouri Agreement.  Pleading in the alternative, upon information and belief, ZTE USA is underfunded, and is the alter ego of ZTE Corp., such that upholding any legal distinction between the two would cause injustice upon Daredevil.

37.     Pursuant to the Missouri Agreement, ZTE Corp. agreed to timely supply the Missouri Equipment in connection with Daredevil's development of the Missouri Network.

38.     The Missouri Agreement also required ZTE Corp. to comply with the various joint venture terms.

39.     The Missouri Agreement required that, in the event of a dispute between the parties, ZTE Corp. submit to certain informal dispute resolution efforts ("IDR Provisions").

40.     ZTE Corp. breached the Missouri Agreement by failing to timely deliver the Missouri Equipment.

41.     ZTE Corp. further breached the Missouri Agreement by repudiating its terms when ZTE Corp. refused to deliver the Missouri Equipment to Daredevil, and instead delivered the equipment to another customer.

42.     Daredevil satisfied all conditions precedent to ZTE Corp.'s performance, unless such obligations were not required or otherwise waived.

43.     Daredevil has been damaged as a proximate result of ZTE Corp.'s breach of the Missouri Agreement in that it lost:

DB04/0837856.0003/6497292.2 DD02

    a.      The opportunity to develop a cellular network in the St. Louis Metropolitan area and thereby suffered lost profits;

    b.      The benefit of the New Products Agreement;

    c.      The benefit of Dealer Agreement;

    d.      The benefit of the Development and Installation Agreement;

    e.      The benefit of the Handset Supplier Agreement;

    f.      The benefit of the EVDO Device Supplier Agreement; and

    g.      The benefit of the Applications and Software Development Joint Venture.

44.    ZTE Corp. was notified of Daredevil's invocation of the IDR Provisions, but ZTE Corp. failed to comply with its obligations pursuant to the IDR Provisions, thereby violating ZTE Corp.'s duty of good faith and fair dealing.

45.    ZTE Corp. continues to refuse to refund the funds Daredevil applied toward the purchase of the Missouri Equipment.

WHEREFORE, Plaintiff, Daredevil, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant ZTE Corp., for monetary damages in excess of $2,600,000, together with lost profits, prejudgment interest, costs and such other relief as the Court deems just and proper.

## COUNT II
### (FRAUD)

46.    Daredevil realleges paragraphs 1 through 45 as set forth above and incorporates the same herein by this reference.

47.    Representatives of ZTE Corp., including Jia, affirmatively represented to representatives of Daredevil that ZTE Corp. could deliver the Missouri Equipment to St. Louis, Missouri by the delivery date called for in the Missouri Agreement.

9

48.     Jia either knew or was sufficiently certain that ZTE Corp. could not timely fulfill the order by the date called for in the Missouri Agreement, or was reckless in making such a representation.

49.     Executives of ZTE USA subsequently confirmed that Jia should not have represented to Daredevil that ZTE Corp. could fulfill its delivery obligations by the date called for in the Missouri Agreement.  According to those executives, delivery by the date called for in the Missouri Agreement would have been impossible at the time Jia made the representation regarding timing of delivery.

50.     ZTE Corp. intended for Daredevil to rely on the misrepresentation when entering into the Agreement and in beginning to build out its Missouri network.

51.     Daredevil relied on the misrepresentation to its detriment when entering into the Missouri Agreement.

52.     It was foreseeable that Daredevil would rely on ZTE Corp.'s misrepresentations.

53.     Daredevil's reliance on ZTE Corp.'s representations was reasonable.

54.     As a result of Daredevil's reliance on ZTE Corp.'s misrepresentations, Daredevil has been damaged.

55.     ZTE Corp.'s false representations were malicious and/or were made with reckless disregard of Daredevil's rights such to warrant the imposition of punitive damages.

WHEREFORE, Plaintiff, Daredevil, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant ZTE Corp. for monetary damages in excess of $2,600,000, together with lost profits, prejudgment interest, punitive damages such as are fair and reasonable, costs and such other relief as the Court deems just and proper.

## COUNT III
### (UNJUST ENRICHMENT)

56.     Daredevil realleges paragraphs 1 through 55 set forth above and incorporates the same herein by this reference.

57.     Pleading in the alternative, plaintiff seeks recovery against ZTE Corp. for unjust enrichment.

58.     Daredevil paid in excess of $2,600,000 to ZTE USA and/or ZTE Corp. in connection with the Missouri Agreement.

59.     Upon information and belief, ZTE Corp. has either shared in, or has retained all of the revenues associated with the sale of the Missouri Equipment to Daredevil.

60.     ZTE Corp. appreciated, realized and retained the benefit of the aforesaid payment from Daredevil.

61.     Despite repeated demand, ZTE Corp. has failed and refused, and continues to refuse, to return the amounts paid by Daredevil to ZTE Corp., and has failed to deliver any benefit whatsoever to Daredevil for such amounts.

62.     ZTE Corp. has been unjustly enriched at Daredevil's expense by receiving the benefit of the payment made by Daredevil in connection with the Missouri Agreement, while failing and refusing to perform and/or return the payment.

WHEREFORE, Plaintiff, Daredevil, Inc., demands entry of judgment in its favor and against Defendant ZTE Corp. in the amount of $2,600,000 dollars, together with prejudgment interest, costs and such other relief as the Court deems just and proper.

DB04/0837856.0003/6497292.2  DD02

## COUNT IV
### (TORTIOUS INTERFERENCE WITH CONTRACT)

63.     Daredevil realleges paragraphs 1 through 34 above and incorporates the same herein by this reference.

64.     Pleading in the alternative, ZTE Corp. has tortiously interfered with a contract between plaintiff and ZTE USA.

65.     A valid and enforceable contract existed as between Daredevil and ZTE USA in the form of the Missouri Agreement.

66.     ZTE Corp. knew of the existence of the Missouri Agreement.

67.     ZTE Corp., intentionally, maliciously, and through wrongful means, caused ZTE USA to breach the Missouri Agreement.

68.     ZTE Corp. acted without justification in causing ZTE USA to breach the Missouri Agreement.

69.     Daredevil has been damaged as a proximate result of ZTE Corp.'s tortious interference with the Missouri Agreement in that Daredevil lost:

a.     The opportunity to develop a cellular network in the St. Louis Metropolitan area and thereby suffered lost profits;

b.     The benefit of the New Products Agreement;

c.     The benefit of Dealer Agreement;

d.     The benefit of the Development and Installation Agreement;

e.     The benefit of the Handset Supplier Agreement;

f.     The benefit of the EVDO Device Supplier Agreement; and

g.     The benefit of the Applications and Software Development Joint Venture.

70.     ZTE Corp.'s conduct was malicious and with reckless disregard of Daredevil's rights such to justify the imposition of punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, Daredevil, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant ZTE Corp., for monetary damages in excess of $2,600,000, together with lost profits, prejudgment interest, punitive damages in an amount to be determined at trial, costs and such other relief as the Court deems just and proper.

Respectfully Submitted,

STINSON MORRISON HECKER LLP

By:    /s/John C. Grellner
      John C. Grellner, #50638MO
      7700 Forsyth Boulevard, Suite 1100
      St. Louis, Missouri 63105
      Telephone:  314-863-0800
      Fax:  314-863-9388
      jgrellner@stinson.com

*Attorneys for Plaintiff Daredevil, Inc.*

13

Agreement

The terms of the attached agreement will apply and are in effect between ZTE and Daredevil Inc. a Missouri corporation and all obligations related to the Saint Louis market will be those of Daredevil Inc.

ZTE will provide Network infrastructure, handsets and a joint venture to develop applications with Daredevil Inc in the Saint Louis Market.

ZTE will cooperate in whatever reasonable manner for the purpose of establishing two way communication of progress and needs and establishing a close team working environment that transcends the borders dividing the countries of these two companies. ZTE will dedicate whatever rescources (including NRE) as are necessary to make the Saint Louis deployment and any applications undertaken by the Saint Louis team comprised of both ZTE and Cleartalk associates an unqualified success. The cost of people dedicated to this venture will be charged to the venture at the amount paid to them for wages. The applications and any software developed by Daredevil or its affiliates pursuant to this agreement, if successfully deployed in the Saint Louis area will be promoted to future customers of ZTE. This joint application development effort aimed at the United States market will be started in Mid November of 2008 with a visit to China from the Development manager of Daredevil. If Daredevil is not satisfied with the cooperative effort exhibited to meet the goals of this joint application development effort, they can escalate meetings with three Chinese based executives of ZTE of successive greater stature to resolve this the last being the most senior officer of ZTE. Weekly (after January 1, 2009) progress meetings involving both US and Chinese teams will be held on a hosted call in number (hosted by ZTE who will set up both a domestic and international bridge for this purpose), and all aspects of this agreement can be discussed at these meetings with the appropriate personel from any of the involved companies if added to an agenda for a given meeting at least two days prior to the meeting.

With in the confines of NDA's they may have signed with other companies, ZTE will work cooperatively with Daredevil to make sure they have access to all the new products ZTE develops for other initiatives including Petmobility, Amberwatch, a CDMA/WIFI phone with ability to track WIFI usage and Internet on airlines ( the last being through an introduction to its client who provides this Aircell).

Following a successful deployment of the Saint Louis market and over 60,000 subscribers being acquired by Daredevil.    ZTE will start to use Daredevil personel as part of its new business development team and compensate Daredevil for their efforts in accordance with Industy norms. In the event Daredevil or its associates is the primary party securing new business for ZTE, Daredevil will be entitled in, addition to fair compensation for its efforts,  to 5% of the sales contracted and ZTE will reasonably approve the sales contracts if they are on substantially similar terms as other contracts with ZTE not including Daredevil.   Daredevil will receive this compensation at the same time as ZTE. This arrangement will be for a three year period and if successful both



EXHIBIT

A

parties will use reasonable best efforts to extend this arrangement. This excludes the
existing operating companies of the NTCH group.

Regarding the deployment in Saint Louis, Daredevil will be the primary responsible party
for completing all aspects of the installation other than integration and making work the
core (switch PDSN, AAA, HLR, SMSC, MMSC, OTA etc) parts of the network.  ZTE
will give Daredevil the right if successful in this endeavor to perform similar functions on
other business they sell and to be compensated for doing so as long as Daredevil provides
ZTE with competitive pricing.  Following the execution of this agreement Daredevil will
open up all the RF planning materials to ZTE to allow ZTE to provide recommendations
in this regard.

The Saint Louis network will be initially comprised of 179 Distributed Software defined
Base stations (out of the intial commitment of 279 base stations) as further decribed in
the attached product specifications also provided to Daredevil by ZTE.  These base
stations will be initially configured with a minimum of one voice and one EVDO Rev A
carrier and will include 30  BTS's to be provided without heat exchangers for indoor use.
ZTE will be responsible at all times for any and all capacity (additional carrier and/or
channel element) growth on these BTS's needed to serve the capacity needs of Daredevil
up to a maximum of three combined voice and/or data carriers per sector for a given
BTS.  Any carriers per BTS beyond three, in the event Daredevil got more spectrum in
the future would be charged at $6,000 for a carrier upgrade across all sectors of a cell
site.  In the event Daredevil wants to deploy up to 16 six sector sites, Daredevil will pay
on delivery an additional $15,000 for each of those six sector sites, ZTE will provide the
technological assistance needed to make these six sector sites work in the network.

The total consideration for this initial deployment will be a down payment of Two
million six hundred thousand.  The remaining balance of this initial contract will be
Three million dollars and will be payable quarterly following the quarter that Daredevil
in Saint Louis exceeds 30,000 paying subscribers. In the first quarter following the
quarter in which Daredevil meets this 30,000 subscriber number, Daredevil will report
their paying subscribers on their normal plan number to ZTE within 15 days of the end of
the quarter and within another 15 days remit $100 for each such subscriber exceeding
30,000.  In subsequent quarters until this amount is fully paid Daredevil will similarly
report and pay based on the subscribers, if any exceeding the count from the prior
quarter.  This will continue if there is sufficient paying subscribers until ZTE has been
paid for 30,000 paying subscribers, or $3,000,000 then will cease.

Following payment for the initial order in the manner set forth above Daredevil will pay
for extra network capacity including all base station elements and all components of or
expansion of the core network and components thereof excluding voicemail at the rate of
$85,000 for each 5,000 subscribers exceeding  50,000  subscribers in Saint Louis and
exceeding  20,000 subscribers in Jackson, Tennessee. All Subscribers referred to in this
agreement are normal subscribers paying one of Daredevils offered plans with a monthly
amount of $20 or more.  This per subscriber payment will be computed in the same

manner as payments were computed in the past to Huweii for the network installed in El Centro California.

Daredevil will be committed to purchase a minimum additional 100 basestations thereafter after this initial order at an amount of $33,000 per base station (including at least one EVDO REV A carrier and one CDMA 1xVoice carrier across three sectors in and outdoor configuration), payable within 30 days of delivery and Daredevil will have ordered all 100 of these base stations within one year of the date the original order of 179 base stations is fully delivered. Thereafter Daredevil can continue to order base stations as it sees fit for the amount of $33,000 US dollars per base station. In the event that Daredevil can not honor this additional order of 100 base stations, and if ZTE is in complete compliance with this agreement and is providing a well functioning network to Daredevil, any additional base stations bought will be at $35,000 and in addition a penalty of $358,000. The purchase order for the for the first such base station is attached hereto.

The core network requirements of the Saint Louis launch will be met by moving one of the BSC's from Jackson Tennessee to Saint Louis , ZTE providing one additional BSC, ZTE providing a Media Gateway and PDSN and having the other major core ancillary items MSCE, MMSC, SMSC, HLR and AAA moved to Saint Louis. Dardevil and or NTCH will then either provide signaling trunks for the Jackson switch to use these components in Saint Louis or they will purchase a Primal box to perform these functions in Jackson Tennessee. On delivery and full functionality of all these components and successful integrations with NTCH's Smartbox application and billing platform, Daredevil will provide payment of an additional $600,000.

All items purchased herein by Daredevil will be freight paid delivered to the Port of Saint Louis at the expense of ZTE. If any items are requested to be air shipped early by Daredevil these amounts will be paid by Daredevil.

The delivery time period for the Network components described above will be as follows:

-By October 30, 2008 30 of the 179 distribution cable bundles (The rest all to come with the delivery on November 15) including all cables ( Alarm, power and fiber optic) terminated on both ends and capable of being used for either a rooftop installation with separated RRU's or a tower installation where the cable bundle largely travels together to the same place, will be delivered to Daredevil in Saint Louis,  on this same date all mounting hardware and brackets to facilitate the early mounting of the RRU's will be delivered to Daredevil in Saint Louis.  In addition the plints or plenums that sit below the battery cabinet on an installation mounted on a slab will be delivered for  15 sites.
-By November 15, 2008  the actual battery cabinets will be delivered for all sites together with mounting hardware and brackets to be mounted on a a wall or on a pole.
-By November 15, 2008  the remaining core network components to be delivered to Saint Louis will be delivered to Daredevil in Saint Louis.

-On January 5, 2008 the first 20 base stations will be delivered to Saint Louis including all the 6 sector base stations.
-On January 31, 2008 the remaining 159 base stations will be delivered to Saint Louis.

In addition to the network items purchased herein it is the intention of the parties that ZTE be the primary supplier of handsets to the operation of Daredevil in Saint Louis and to the other affiliated operations of Daredevil and NTCH, including Flat Wireless in Texas. In this regard and for a period of 5 years from this date ZTE agrees to these entities to match the cost of any other handsets being sold and available to the parties based on comparable features or adjusted if needed for the added BOM costs of added features. The intital pricing of the C79 candybar phone will be priced to the parties at $100.01 however marketing development funds (MDF)will be provided to the buyer of $13 for the initial order of this phone which will be 20,000 units. The C78 handset will similarly be provided at $140.01 with a MDF amount of $28. The initial order of this phone will be 10,000 units. The CMT will be used to promote the ZTE handset in Cleartalk branded advertising. The parties will further work together to enhance the ZTE handset lineup and offer new handsets that work with the applications being developed by the parties provided the applications are showing promising commercial success. EVDO data cards will , if ZTE is importing EVDO cards by that date, be provided to Daredevil no later than the end of March 2009 at a cost no more than 1 cent above that sold to other carriers, or less and not to exceed $100.

The above largely sets out the expectations and ways the companies expect to bring this project together and work as a team. However it is important to spell out the consequences if all the items above are not provided within the timeframes spelled out (unless prevented by a natural disaster) and in a manner to work in a reasonable manner. If all the above items are not delivered in good functioning order within the time period specified Daredevil will not be required to pay any additional amounts for the delivery of the intial network and will not be required to buy the additional base stations. If Daredevil decides to replace this network with another network as a result of non delivery or faulty equipment ZTE will promptly buy back this network at the amount paid to date and will also pay up to  1 million in costs to deinstall the  network.

This agreement has been reviewed by both parties and none of the language herein will be construed against the drafter.

Choice of law, This agreement will be construed under the laws of the State of Missouri and any dispute that requires it will be under the jurisdiction of Missouri.

ZTE will provide reasonable spares for this network for the term of the 18 month warranty period and any extended warranty period which Daredevil may elect by paying an amount based on $1,000 per deployed base station at the beginning of the first and second years following the expiriation of the warranty period and $2,000 per deployed basestation thereafter.

Additional terms as included. If there is any conflict this initial five page agreement will take precedence.

Date    9-25-08

Daredevil Inc. by Eric Steinmann, Development Manager

ZTE Inc. by Joey Jia, General Manager

THE PARTIES AGREE THAT THIS AGREEMENT
WILL BE KEPT COMPLETELY CONFIDENTIAL.

To the extent that Huweii raises the price to NTCH on the Tennessee, Washington and Idaho Markets it has already quoted, and up to an amount of $500,000, ZTE will reduce the amount owed to them by Daredevil in Saint Louis by the amount, if any, that Huweii raises the price to NTCH in these other markets. NTCH will use its best efforts to negotiate this amount if any to the lowest amount and will provide to ZTE an email history of these negotiations showing that they were reasonable in doing this.

The amount  amount of the deposit for the Daredevil Saint Louis market is currently owed to Eric Steinmann and or PTA FLA, Inc, NTCH Inc. which entities hereby agree  to this amount being credited to the equipment purchase for Saint Louis of Daredevil and have been compensated accordingly by Daredevil for this agreement..

NTCH, Inc., PTA Fla, Inc. and  in his individual capacity

_____

Eric Steinmann, Development Manager


ZTE USA, Inc.

_____

Joey Jia General Manager

**ZTE中兴**

Date: 8/21/2007
Client (Customer):Cleartalk
Project Name: St.Louis

Price Schedule for Kennewick CDMA Project

Delivery Dates.......(Available at a specified US port, custom clearance time may be extra)

| NO. | Item | Qty | Unit Price($) | Price ($) | Delivery Dates |
|---|---|---|---|---|---|
| | Main Equipment | | | | |
| 1 | CDMA Mobile Communication BSC supports 25K users (2000 mins) | 1 | $142,441 | $142,441 | Dec. 15 07 |
| | | | | | |
| 2 | AWS Handsets  Pricing to Be Determined Monthly | | | | Feb 1 08 |
| | | | | | |
| 3 | CDMA Mobile Communication BTS and Battery Backup | | | | |
| 3.1 | CBTS O1 60W **** S111 Outdoor | 20 | $33,562 | $671,240 | Dec 15 07 |
| 3.2 | BTSB I4 40W **** S111111 Indoor | 0 | $43,000 | $0 | Dec 15 07 |
| 3.3 | CBTS I2 60 W **** S111 Indoor | 0 | $29,062 | $0 | Dec 15 07 |
| 3.4 | CBTS O1 60W **** S222 Outdoor | 0 | $38,286 | $0 | Dec 15 07 |
| 3.5 | BTSB I4 40W **** S222222 Indoor | 0 | $59,027 | $0 | Dec 15 07 |
| 3.6 | CBTS I2 60 W **** S222 Indoor | 0 | $33,786 | $0 | Dec 15 07 |
| 3.7 | CBTS O1 60W **** S111111 Outdoor | 0 | $53,545 | $0 | |
| 3.8 | MBTS 20W with 2 RF heads **** S1 Outdoor | 15 | $22,227 | $333,405 | |
| | EVDO upgrade | 10 | $5,000 | $50,000 | |
| | | | | | |
| 3.4 | ** Battery Backup**** | | | | |
| | U.S.A.-Power for BTSB I4 site (Rectifier Only) | 0 | $3,278 | $0 | Dec 15 07 |
| | U.S.A.-Power for CBTS O1 site | | | | |
| | U.S.A.-Power for CBTS I2 site (Rectifier Only) | 0 | $2,846 | $0 | Dec 15 07 |
| | U.S.A.-Power for center room | | | | |
| | | | | | |
| 4 | CDMA Mobile Communication MSS | 1 | | | |
| 4.1 | MSCe supports 120K users( 2000 mins) | 0 | $292,888 | $0 | Dec 15 07 |
| 4.2 | MGW supports 25K users( 2000 mins) | 1 | $155,513 | $155,513 | dec 15 07 |
| 4.3 | HLR supports 120K users( 2000 mins) | 0 | $0 | $0 | Dec 15 07 |
| | | | | | |
| 5 | PDSN | 1 | $92,868 | $92,868 | Dec 15 07 |
| 6 | SMS/MMS/WAP | 0 | $25,000 | $0 | Dec 15 07 |
| 7 | OTA | 0 | $204,493 | $0 | Dec 15 07 |
| | | | | | |
| 8 | Standard industry spares for base stations | 1 | incl | | |
| 9 | Standard industry spares for switching | 1 | incl | | |
| 10 | OMM  Superviscsy SubSystem | 1 | $1,120 | $1,120 | Dec 15 07 |
| | Equipment Price CIF (** port in US) | | | $1,446,586 | |
| | | | | | |
| 11 | Services (project management and installation of core equipment) | 1 | $110,000 | $110,000 | |
| | | | | | |
| | Total Price | | | $1,556,586 | |

**ZTE中兴**

Date: 8/21/2007
Client (Customer):Cleartalk
Project Name: St.Louis

Price Schedule for Grandjunction CDMA Project

Delivery Dates.......(Available at a specified US port, custom clearance time may be extra)

| NO. | Item | Qty | Unit Price($) | Price ($) | Delivery Dates |
|---|---|---|---|---|---|
| | Main Equipment | | | | |
| 1 | CDMA Mobile Communication BSC supports 15K users (2000 mins) | 1 | $134,632 | $134,632 | Dec. 15 07 |
| 2 | AWS Handsets  Pricing to Be Determined Monthly | | | | Feb 1 08 |
| 3 | CDMA Mobile Communication BTS and Battery Backup | | | | |
| 3.1 | CBTS O1 60W **** S111 Outdoor | 18 | $33,562 | $604,116 | Dec 15 07 |
| 3.2 | BTSB I4 40W **** S111111 Indoor | 0 | $43,000 | $0 | Dec 15 07 |
| 3.3 | CBTS I2 60 W **** S111 Indoor | 0 | $29,062 | $0 | Dec 15 07 |
| 3.4 | CBTS O1 60W **** S222 Outdoor | 0 | $38,269 | $0 | Dec 15 07 |
| 3.5 | BTSB I4 40W **** S222222 Indoor | 0 | $59,027 | $0 | Dec 15 07 |
| 3.6 | CBTS I2 60 W **** S222 Indoor | 0 | $33,786 | $0 | Dec 15 07 |
| 3.7 | CBTS O1 60W **** S111111 Outdoor | | $53,545 | | |
| 3.8 | MBTS 20W with 2 RF heads **** S1 Outdoor | 9 | $22,227 | $200,043 | |
| | EVDO upgrade | 9 | $5,000 | $45,000 | |
| 3.4 | ** Battery Backup**** | | | | |
| | U.S.A.-Power for BTSB I4 site (Rectifier Only) | 0 | $3,278 | $0 | Dec 15 07 |
| | U.S.A.-Power for CBTS O1 site | | | | |
| | U.S.A.-Power for CBTS I2 site (Rectifier Only) | 0 | $2,846 | $0 | Dec 15 07 |
| | U.S.A.-Power for center room | | | | |
| 4 | CDMA Mobile Communication MSS | 1 | | | |
| 4.1 | MSCe supports 120K users( 2000 mins) | 0 | $292,898 | $0 | Dec 15 07 |
| 4.2 | MGW supports 15K users( 2000 mins) | 1 | $126,979 | $126,979 | dec 15 07 |
| 4.3 | HLR supports 120K users( 2000 mins) | 0 | $0 | $0 | Dec 15 07 |
| 5 | PDSN | 1 | $92,868 | $92,868 | Dec 15 07 |
| 6 | SMS/MMS/WAP | 0 | $25,000 | $0 | Dec 15 07 |
| 7 | OTA | 0 | $204,493 | $0 | Dec 15 07 |
| 8 | Standard industry spares for base stations | 1 | incl | | |
| 9 | Standard industry spares for switching | 1 | incl | | |
| 10 | OMM  Supervisory SubSystem | 1 | $1,120 | $1,120 | Dec 15 07 |
| | Equipment Price CIF (** port in US) | | | $1,204,757 | |
| 11 | Services (project management and installation of core equipment) | 1 | $90,000 | $90,000 | |
| | Total Price | | | $1,294,757 | |

**ZTE中兴**

Date: 8/21/2007
Client (Customer):Cleartalk
Project Name: St.Louis

Price Schedule for Daredevil St Louis CDMA Project

Delivery Dates........(Available at a specified US port, custom clearance time may be extra)

| NO. | Item | Qty | Unit Price($) | Price ($) | Delivery Dates |
|---|---|---|---|---|---|
| | Main Equipment | | | | |
| 1 | CDMA Mobile Communication BSC supports 120K users (2000 mins) | 1 | $287,180 | $287,180 | Dec. 15 07 |
| | | | | | |
| 2 | AWS Handsets  Pricing to Be Determined Monthly | | | | Feb 1 08 |
| | | | | | |
| 3 | CDMA Mobile Communication BTS and Battery Backup | | | | |
| 3.1 | CBTS O1 60W **** S111 Outdoor | 40 | $36,918 | $1,476,720 | Dec 15 07 |
| 3.2 | BTSB I4 40W **** S111111 Indoor | 40 | $47,300 | $1,892,000 | Dec 15 07 |
| 3.3 | CBTS I2 60 W **** S111 Indoor | 5 | $31,968 | $159,840 | Dec 15 07 |
| 3.4 | CBTS O1 60W **** S222 Outdoor | 15 | $42,114 | $631,710 | Dec 15 07 |
| 3.5 | BTSB I4 40W **** S222222 Indoor | 15 | $60,530 | $907,946 | Dec 15 07 |
| 3.6 | CBTS I2 60 W **** S222 Indoor | 5 | $37,114 | $185,570 | Dec 15 07 |
| 3.7 | CBTS O1 60W **** S111111 Outdoor | | $58,900 | | |
| | | | | | |
| 3.4 | ** Battery Backup**** | | | | |
| | U.S.A.-Power for BTSB I4 site (Rectifier Only) | 55 | $3,278 | $0 | Dec 15 07 |
| | U.S.A.-Power for CBTS O1 site | | | | |
| | U.S.A.-Power for CBTS I2 site (Rectifier Only) | 10 | $2,846 | $0 | Dec 15 07 |
| | U.S.A.-Power for center room | | | | |
| | Battery | 65 | $4,000 | $0 | |
| | | | | | |
| 4 | CDMA Mobile Communication MSS | 1 | | | |
| 4.1 | MSCe supports 120K users( 2000 mins) | 0 | $195,265 | $0 | Dec 15 07 |
| 4.2 | MGW supports 120K users( 2000 mins) | 1 | $339,857 | $339,857 | dec 15 07 |
| 4.3 | HLR supports 120K users( 2000 mins) | 0 | $249,213 | $0 | Dec 15 07 |
| | | | | | |
| | | | | | |
| 5 | PDSN supports 6K fx data users ***** | 0 | $92,868 | $0 | Dec 15 07 |
| 6 | SMS/MMS/WAP ***** | 1 | $611,850 | $120,000 | Dec 15 07 |
| 7 | OTA | 0 | $204,493 | $0 | Dec 15 07 |
| | | | | | |
| 8 | Standard industry spares for base stations | 1 | incl | | |
| 9 | Standard industry spares for switching | 1 | incl | | |
| 10 | OMM  Supervisory SubSystem | 1 | $1,120 | $1,120 | Dec 15 07 |
| | Equipment Price CIF (** port in US) | | | $6,001,943 | |
| | | - | Micro BTS | $156,000 | |
| | | + | upgrade in FL | $0 | |
| | | | | $5,845,943 | |
| | | | | | |
| 11 | Services (project management and installation of core equipment) | 1 | $550,000 | $550,000 | |
| | | | | | |
| | Total Price | | | $6,395,943 | $53.30 |

**ZTE中兴**

Date: 8/21/2007<br>
Client (Customer):Cleart&R<br>
Project Name: St.Louis

Price Schedule for Daredevil St Louis CDMA Project

Delivery Dates........(Available at a specified US port, custom clearance time may be extra)

| NO. | Item | Qty | Unit Price($) | Price ($) | Delivery Dates |
|---|---|---|---|---|---|
|  | Main Equipment |  |  |  |  |
| 1 | CDMA Mobile Communication BSC supports 20K users (2000 mins) | 1 | $138,074 | $138,074 | Dec. 15 07 |
|  |  |  |  |  |  |
| 2 | AWS Handsets  Pricing to Be Determined Monthly |  |  |  | Feb 1 08 |
|  |  |  |  |  |  |
| 3 | CDMA Mobile Communication BTS and Battery Backup |  |  |  |  |
| 3.1 | CBTS O1 60W **** S111 Outdoor | 32 | $33,562 | $1,073,984 | Dec 15 07 |
| 3.2 | BTSB I4 40W **** S111111 Indoor | 0 | $43,000 | $0 | Dec 15 07 |
| 3.3 | CBTS I2 60 W **** S111 Indoor | 0 | $29,062 | $0 | Dec 15 07 |
| 3.4 | CBTS O1 60W **** S222 Outdoor | 0 | $38,286 | $0 | Dec 15 07 |
| 3.5 | BTSB I4 40W **** S222222 Indoor | 0 | $59,027 | $0 | Dec 15 07 |
| 3.6 | CBTS I2 60 W **** S222 Indoor | 0 | $33,786 | $0 | Dec 15 07 |
| 3.7 | CBTS O1 60W **** S111111 Outdoor |  | $53,545 | $0 |  |
| 3.8 | MBTS 20W with 2 RF heads **** S1 Outdoor | 29 | $22,227 | $644,583 |  |
|  | EVDO upgrade | 16 | $5,000 | $80,000 |  |
|  |  |  |  |  |  |
| 3.4 | ** Battery Backup**** |  |  |  |  |
|  | U.S.A.-Power for BTSB I4 site (Rectifier Only) | 0 | $3,278 | $0 | Dec 15 07 |
|  | U.S.A.-Power for CBTS O1 site |  |  |  |  |
|  | U.S.A.-Power for CBTS I2 site (Rectifier Only) | 0 | $2,846 | $0 | Dec 15 07 |
|  | U.S.A.-Power for center room |  |  |  |  |
|  |  |  |  |  |  |
| 4 | CDMA Mobile Communication MSS | 1 |  |  |  |
| 4.1 | MSCe supports 180K users( 2000 mins) | 1 | $292,898 | $292,898 | Dec 15 07 |
| 4.2 | MGW supports 20K users( 2000 mins) | 1 | $141,414 | $141,414 | dec 15 07 |
| 4.3 | HLR supports 180K users( 2000 mins) | 1 | $373,820 | $373,820 | Dec 15 07 |
|  |  |  |  |  |  |
| 5 | PDSN | 1 | $92,868 | $92,868 | Dec 15 07 |
| 6 | SMS/MMS/WAP | 0 | $25,000 | $0 | Dec 15 07 |
| 7 | OTA | 0 | $204,493 | $0 | Dec 15 07 |
|  |  |  |  |  |  |
| 8 | Standard industry spares for base stations | 1 | incl |  |  |
| 9 | Standard industry spares for switching | 1 | incl |  |  |
| 10 | OMM  Supervisory SubSystem | 1 | $1,120 | $1,120 | Dec 15 07 |
|  | Equipment Price CIF (** port in US) |  |  | $2,838,761 |  |
|  |  |  |  |  |  |
| 11 | Services (project management and installation of core equipment) | 1 | $100,000 | $100,000 |  |
|  |  |  |  |  |  |
|  | Price 20K  — I |  |  | $2,938,761 |  |
|  | Price 25K  — K |  |  | $1,556,586 |  |
|  | Price 15K  — G |  |  | $1,294,757 | $5,790,104 |
|  | Price St. Louis |  |  | $6,395,943 | $5,525,104 |
|  | **Total Price** |  |  | **$12,186,047** |  |
|  |  |  |  | $265,000 | EVDO Price |
|  |  |  |  | $11,921,047 | w/o EVDO |

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## MASTER SUPPLY AGREEMENT

This Master Supply Agreement (the "Agreement") is entered into and made effective as of _September 25, 2508 (the "Effective Date") by and between:

ZTE USA, Inc. ("ZTE") having a place of business at 2425 Central Expressway, Suite 323, Richardson, TX 75080; and Daredevil Inc.  dba ClearTalk ("Customer") having a place of business at 1356 South Fifth Street, St. Charles, Mo. 63301.

**WHEREAS**, ZTE is a manufacturer and/or supplier of certain telecommunications Products *(defined herein as equipment, hardware, and associated materials, exclusive of software content)*, related Software Licenses, and/or Installation, Engineering and Training Services.

**WHEREAS**, Customer desires to acquire from ZTE various Products, related Software Licenses, and/or Installation, Engineering and Training Services Equipment all as described herein below and under the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing premises and the covenants herein contained the parties agree to be bound as follows:

1.    **Listing of Schedules**

One or more of the following Schedules may be attached hereto and shall be deemed applicable to and incorporated into this Agreement:

       Schedule 1 "Description of Project"
       Schedule 2 "Share of Responsibilities (SOR)"
       Schedule 3 "Bill of Materials and Delivery Dates "
       Schedule 4 "Specifications"
       Schedule 5 "Guaranteed future pricing caps"
       Schedule 6 "Training Schedule"
       Schedule 7 "Acceptance Test Procedure"
       Schedule 8 "Vendor Financing Agreement"
       Schedule 9 "Equipment Provided Switch Room"
       Schedule 10 "Tennessee & St. Louis Market Budgetary Price"

**EXHIBIT**

B

**ZTE中兴**

Master Supply Agreement Version 9/25/08

**2.      The Project**

Customer intends to implement a telecommunications project ("The Project") as
described in **Schedule 1 "Description of Project"** attached hereto.  In connection
therewith, the parties shall perform those certain respective obligations and tasks as
described in the attached **Schedule 2 "Share of Responsibilities (SOR)"** and in
accordance with the terms hereof.

**3.      Ordering of Equipment, Software Licenses, and Services**

Customer shall timely issue Purchase Orders or other written documents to ZTE to
acquire required Products, related Software Licenses, and/or Installation, Engineering and
Training Services, such items including  those described in **Schedule 3, "Bill of
Materials and List of Deliverables"** with the pertinent specifications thereof, if any,
being as described in **Schedule 4 "Product Specifications"**.

Each Purchase Order after the initial purchase order reflected in the attached shall be
subject to ZTE's acceptance and confirming written (including email or fax)
acknowledgment, if not promptly acknowledged it will only be because the purchase
order does not conform to this agreement.  The delivery date(s) for such Products,
Software, and/or Installation, Engineering and Training Services shall be in accordance
with that shown in **Schedule 2 "Share of Responsibilities (SOR)" or as stated in
Schedule 3 attached**.  The issuance and subsequent acceptance of any such Purchase
Order, or the mutual execution by the parties of any similar written ordering document,
shall establish a purchase agreement between Customer and ZTE in accordance with and
subject to the terms and conditions in this Master Supply Agreement and the Schedules
attached hereto.

**4.      Prices**

After the initial order, Prices for Subsequent Products, related Software Licenses, and/or
Installation, Engineering and Training Services are in US Dollars and are not to exceed
those prices set forth in **Schedule 5 "Gauranteed future Price Caps"** attached hereto.
Prices set forth in Schedule 5 may if in accordance with the market for competitive
products be increased by up to 5% annually commencing January 1 of 2010.

The prices are CIF and as such equipment will be delivered to the nearest US Port of
customers selection  however USA domestic transportation charges, non-standard
packing, and any applicable sales taxes, or other similar impositions as may be payable
by ZTE.  All such additional itemized charges are to be reimbursed to ZTE by Customer.

**5.      Payment Terms**

**ZTE中兴**

Master Supply Agreement Version 9/25/06

The full purchase price for Products and related Software Licenses and Services, and any associated prepaid freight transportation charges, insurance costs and taxes as itemized on ZTE's invoice(s), shall be due and payable in US Dollars as follows:

a)  10% of the total purchase price upon issuance by Customer of the Purchase Order (see Schedule 3 for details) ; and

b)  with the remaining 90% of the total purchase price being invoiced by ZTE either upon the successful completion of testing pursuant to **Schedule 7 "Acceptance Test Procedure"**, or when commercial use of the Products is made by Customer following such Acceptance, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE  If not returned as not suitable for the intended function. , **whichever first occurs**, such invoiced amount being payable pursuant to the provisions of **Schedule 8 "Vendor Financing Agreement"** attached hereto.

However any further major system purchases exceeding $1,000,000 US on a single purchase order will be financed under the same provisions as Schedule 8, provided that Cleartalk is not in default in its payment obligations thereunder, as long as the total outstanding balance to ZTE including the new purchase order does not exceeds the 2 times the collateralized asset or the amounts previously paid ZTE by Customer or its affiliates.

1.  30% of down-payment will be made upon issuance by Customer of the Purchase Order
2.  with the remaining 70% of the total purchase price being invoiced by ZTE either upon the successful completion of testing pursuant to **Schedule 7 "Acceptance Test Procedure"**, or when commercial use of the Products is made by Customer Following the Acceptance Testing, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE if not returned as not suitable for the intended function, **whichever first occurs**, such invoiced amount being payable pursuant to the provisions of **Schedule 8 "Vendor Financing Agreement"** attached hereto.

It is further understood and agreed that all past due undisputed balances will bear interest at one and one-half percent (1 1/2%) per month (or at the maximum interest rate allowed by law if such interest rate is lower), and that Customer shall pay to ZTE upon demand any charges or costs, including reasonable attorneys fees, incurred in connection with the collection of any past due amount..

6.   Delivery

ZTE will pack the Products purchased hereunder for transport in accordance with its commercial standards and will deliver Products to a carrier selected by ZTE.  Prices are

**ZTE中兴**

Master Supply Agreement Version 9/25/06

The full purchase price for Products and related Software Licenses and Services, and any associated prepaid freight transportation charges, insurance costs and taxes as itemized on ZTE's invoice(s), shall be due and payable in US Dollars as follows:

  a) 10% of the total purchase price upon issuance by Customer of the Purchase Order (see Schedule 3 for details) ; and

  b) with the remaining 90% of the total purchase price being invoiced by ZTE either upon the successful completion of testing pursuant to **Schedule 7 "Acceptance Test Procedure"**, or when commercial use of the Products is made by Customer following such Acceptance, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE  If not returned as not suitable for the intended function. , **whichever first occurs**, such invoiced amount being payable pursuant to the provisions of **Schedule 8 "Vendor Financing Agreement"** attached hereto.

However any further major system purchases exceeding $1,000,000 US on a single purchase order will be financed under the same provisions as Schedule 8, provided that Cleartalk is not in default in its payment obligations thereunder, as long as the total outstanding balance to ZTE including the new purchase order does not exceeds the 2 times the collateralized asset or the amounts previously paid ZTE by Customer or its affiliates.

  1.   30% of down-payment will be made upon issuance by Customer of the Purchase Order
  2.   with the remaining 70% of the total purchase price being invoiced by ZTE either upon the successful completion of testing pursuant to **Schedule 7 "Acceptance Test Procedure"**, or when commercial use of the Products is made by Customer Following the Acceptance Testing, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE if not returned as not suitable for the intended function, **whichever first occurs**, such invoiced amount being payable pursuant to the provisions of **Schedule 8 "Vendor Financing Agreement"** attached hereto.

It is further understood and agreed that all past due undisputed balances will bear interest at one and one-half percent (1 1/2%) per month (or at the maximum interest rate allowed by law if such interest rate is lower), and that Customer shall pay to ZTE upon demand any charges or costs, including reasonable attorneys fees, incurred in connection with the collection of any past due amount..

6.    Delivery

ZTE will pack the Products purchased hereunder for transport in accordance with its commercial standards and will deliver Products to a carrier selected by ZTE.  Prices are



Master Supply Agreement Version 9/25/06

they have received from Cleartalk or its Gaurantors on its obligations if requested to do so by Cleartalk.

## 10.   Software License

ZTE hereby grants to Customer, and Customer accepts, a personal, non-exclusive, non-transferable and restricted right and license to use the Software comprising the subject matter of a purchased Software License, further subject to the provisions and limitations as set forth below:

(A) the Software and any supporting documentation furnished hereunder is to be used by Customer for its own business activities solely in conjunction with the normal and intended use and operation of the Products purchased hereunder, the Products and Software together constituting a Licensed System;

(B) the right of Customer to use the Software is now and throughout the term of the license contingent upon the payment by Customer to ZTE of all applicable fees;

(C) licensed use is limited to the executable software as delivered by ZTE to Customer and does not permit modification or use of any modified form of the Software, notwithstanding any claim by Customer of any defect in the Software;  Customer may not duplicate the Software, except to make a backup copy of the software for use in the event of system failure;

(D) the Software and any documentation furnished are the property of ZTE and are to be considered ZTE proprietary information;  Customer shall not disclose, provide or otherwise make available the Software or documentation, or any part thereof, in any form, to any third party, before or after termination of this Agreement, except as may be permitted in writing by ZTE; Customer shall immediately notify ZTE, in writing, of any knowledge that any unlicensed party possesses the Software or documentation;  Customer shall safeguard said Software and documentation with the highest degree of care and diligence;

(E) any configuration, application, or arrangement of the Software and its systems into networks, shall not be considered a derived product with any distinction in ownership from that of the Software as received by Customer;

(F) any distinct and separate element of software in the form of instruction macros, test cases, simulation data, or similar forms of intellectual property, which is produced by normal use of the Software and is initially dependent upon the Software for execution, shall be considered a derived product to which ZTE retains title and to which Customer is granted an exclusive right to use solely in its dependent form, and in conjunction with, the Software licensed hereunder and the Licensed System;

(G) the Software provided to Customer under this Agreement is in object code format;  Unless software modification is needed for market operations, ZTE expressly prohibits, and Customer agrees to refrain from, any attempt by Customer or Customer's agent(s) to tamper with, disassemble, reverse compile, reverse engineer, or, in any similar way, expose the actual instruction sequences, internal logic, protocols, algorithms or other intellectual property represented within the Software, which ZTE considers to be its proprietary information and trade secret whether or not said intellectual property is included in any patent or copyright;  Any product derived from, or resulting from, such effort by Customer or any other party shall be deemed the property of ZTE, for which no right to use is granted to Customer herein and for which ZTE shall bear no obligations for support;

**ZTE中兴**

(H) this Software License, and the rights and obligations of Customer shall not be pledged, mortgaged, assigned, sub-licensed or otherwise transferred or disposed of, including by operation of law, in whole or in part, by Customer unless consented to in writing by ZTE; except that Customer shall have the right, in association with a resale of a Licensed System or related services to an end-user, to sublicense the use of the Software to such end-user pursuant to a software license agreement containing terms substantially similar to those contained herein;

(I)     the license granted herein shall continue for so long as the Licensed System upon which the Software is running remains in service by Customer, unless Customer is delinquent making any required payments to ZTE or is in breach of this agreement or in material violation of any of its terms, or as may be provided elsewhere herein, in which event the license granted herein shall terminate upon written notification thereof to Customer by ZTE; Upon termination of the license, all use of the Software by Customer shall immediately cease and all copies of the Software and related documentation shall be immediately returned by Customer at its expense to ZTE.

(II)    ZTE agrees to only have the access to this network and information on the Subscribers of Customer, when installed, that is specifically authorized by customer and will agree to train Customer in a specific procedure that Customer can implement in less than 5 minutes time that will cut off any access to the Network from any or all outside parties without impacting the function of the network. If Customer chooses to have this process verified by an independent outside source and it is found to not work for its stated purpose , ZTE will pay all charges related to this investigation and any remediation to make this conform. If any functionality is found in the network designed for the purpose of Spying or that could be used to disable the network by those intending harm to Customer, its customers, or its country, if not clearly inadvertent will be reason for Customer to suspend all payments due to ZTE and submit a complaint to the dispute resolution function later described in this agreement, and if such functionality is reasonably determined to be intentional or not correctible, ZTE will be responsible for the cost of replacement of this network with a network of Customers choosing.

## 11.    Taxes

Prices for Products, Software Licenses and/or Installation or Training Services do not include any state, federal, national, county or local sales, use or excise taxes (or other duties, fees, or similar charges however designated) applicable to this transaction, and the Customer expressly agrees to pay to ZTE, (in addition to the Prices specified), the amount of any such taxes that may be imposed upon and therefore payable by ZTE as shall be determined by the shipping destination specified by the Customer. All applicable taxes, duties, fees and similar costs incurred will be billed to the Customer by ZTE unless Customer's Purchase Order is accompanied by valid tax exemption certificates or equivalent legal waiver documents. It is further understood that any and all taxes, customs or duties which may be imposed on payments by the Customer to ZTE for Products, Software Licenses and/or Installation or Training Services are the sole obligation of the Customer and may not be deducted from amounts due to ZTE hereunder. Notwithstanding the foregoing, Customer shall not be liable for any taxes imposed upon or made payable by ZTE against the net income of ZTE.

## 12.    Termination

**ZTE中兴**

If the Customer petitions to reorganize under a Bankruptcy Act or is adjudicated bankrupt or if a receiver is appointed for the Customer's business or if the Customer makes an assignment for the benefit of creditors or fails to make payments of any undisputed sum due hereunder, ZTE will have the immediate right to terminate this Agreement, cease all further performance, and enter the Customer's premises for the purpose of repossessing and removing any items subject to a security interest in favor of ZTE and all ZTE-owned Products and/or Software.  ZTE's termination of this Agreement or such taking of possession will be without prejudice to any other rights and remedies that ZTE may have. The Customer's obligation to pay all ZTE invoices as may be accrued will survive any termination action.  The provisions of this paragraph relating to termination and repossession shall have force and effect only if and then to the extent that the entire then outstanding indebtedness of Customer to ZTE is not fully and unconditionally secured by a bank Letter of Credit pursuant to the terms of **Schedule 8 "Vendor Financing Agreement".**

13.    **Warranty Provisions**

Subject to the limitations stated herein, Products manufactured by ZTE (exclusive of Software originated and supplied by ZTE) is warranted to comply with ZTE's standard published commercial specifications and to be free of defects in workmanship and material at the time of delivery to the Customer for a period of Eighteen (18) months. Software originated and supplied by ZTE is warranted to substantially perform in accordance with the published ZTE specifications for a period of Eighteen (18) months. Notice of any claimed defect must be given in writing during the warranty period.  Any Products or Software supplied by but not of ZTE's manufacture or origination shall be subject only to the warranty of the manufacturer or originator thereof, which warranty shall be conveyed and assigned to the Customer. Such warranty will also apply to the reasonable functioning of software and hardware purchased by Customer for the Purpose described in attachment 1.

ZTE will either repair, correct or replace any such defective Product of its manufacture or defective Software of its origin and supply, with new or equivalent Products or Software so as to make the Product or Software conform to this warranty, , provided that:

(A)    If ZTE provides packing material and prepays for shipping, the defective Product or Software is returned to ZTE at its designated US location, transportation prepaid and risk of loss borne by Customer, in accordance with ZTE's instructions including a Returned Material Authorization (RMA) which shall be promptly given;

**ZTE中兴**

Master Supply Agreement Version 9/25/08

(B)   an inspection of the returned Products or Software by ZTE clearly indicates the defect was not caused by abuse, or improper use, maintenance, repair, installation or tampering or alteration;

Such option is only available in the event that Customer is able to maintain daily operations without interference due to the defective equipment.  In the event a defective product causes intrusion of daily operations, ZTE must choose the most immediate recourse to correct the issue.

Any equipment, accessory, or part repaired or replaced by ZTE pursuant to the terms of this warranty shall be returned to Customer transportation prepaid and risk of loss borne by ZTE, and continue to be warranted for period of 12 months.

The Product and Software warranties herein shall be deemed to have commenced upon the first to occur of successful completion of testing pursuant to **Schedule 7 "Acceptance Test Procedure"**, commercial use of the Products by Customer, or one (1) year following issuance by Customer of the initial Purchase Order Provided such item warranted is at that time reasonably performing its intended function in Customers network. ,

Any Replacement parts or repairs to defective parts performed after the warranty period will be priced to customer at there reasonable percent value as related to the price of a new component sold to Customer as set forth in the pricing agreement hereto.

ZTE warrants that its Installation, Engineering and Training Services shall be performed in a good and workmanlike manner and that any related installation material supplied by ZTE shall be free from material defects in workmanship.  If the Services provided shall be found defective within one (1) year from the date of completion of said Services, ZTE shall fulfill this warranty through repair or replacement of any installation materials and/or correction of installation errors provided written notice of the claimed defect is given to ZTE promptly upon discovery and in any event, within the services warranty period.

IN THE ABSENCE OF A SEPARATE SERVICE OR MAINTENANCE AGREEMENT BETWEEN ZTE AND CUSTOMER CONTAINING NEGOTIATED TERMS, SERVICE LEVELS, AND PRICES, THE FOREGOING WARRANTY PROVISIONS SHALL CONSTITUTE ZTE'S ENTIRE LIABILITY AND CUSTOMER'S SOLE RIGHT AND REMEDY WITH RESPECT TO DEFECTIVE PRODUCTS, SOFTWARE, AND/OR INSTALLATION SERVICES, WHETHER CLAIMS ARE MADE OR REMEDIES ARE SOUGHT IN CONTRACT OR TORT OR UNDER ANY OTHER LEGAL THEORY (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE).

8

**ZTE中兴**

Master Supply Agreement Version 9/25/06

THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE.  THERE ARE NO WARRANTIES WHICH EXTEND
BEYOND THE PROVISIONS STATED HEREIN.  THERE ARE NO WARRANTIES
EITHER EXPRESSED OR IMPLIED OR ANY AFFIRMATION OF FACT OR
REPRESENTATION EXCEPT AS SPECIFICALLY SET FORTH HEREIN.

### 14.  Excusable Delays

ZTE will not be liable for delays in performance or a failure to perform hereunder due to
unforeseen interruptive circumstances or causes beyond its control including, but not
limited to, acts of God, acts of any government, wars, riots, fires, floods, accidents,
strikes, or embargoes   In the event of such delays the schedules shall be extended for
such additional period of time as is determined to be equitable by the parties.

### 15.  Substitutions and Modifications

ZTE reserves the right, at any time before delivery or acceptance, whichever is later, to
modify, replace or substitute Products or their components of its manufacture, or
materials procured from its suppliers, and relevant Software to be supplied, provided that
such modification, replacement or substitution does not adversely affect the operational
requirements or performance or maintenance of the particular Products and Software to
be delivered and will not result in additional charges to Customer.

### 16.  License and Permits

Any licenses or permits required by any State, municipality or other governmental body
to install, provide or operate the Products or Software or services furnished by ZTE shall
be the responsibility of the Customer.  ZTE is responsible for any US government and
FCC compliance at the time of shipment. Any quotation, offer, or sale by ZTE involving
the export or transfer of Products and/or Software outside of the United States is subject
to and conditioned upon compliance with the export control laws of the U.S., including
the issuance of an export license by the appropriate U.S. government department or
agency to the extent required by law.

Any modifications to software or equipment required to meet Government mandates after
delivery of the equipment will be performed by ZTE at a rate reasonable derived to yield
to ZTE a profit of no more than 10% on this service.

### 17.  Confidential Information

Customer acknowledges that it has or will come into possession of valuable proprietary
information and trade secrets of ZTE and visa versa during the negotiation of this

**ZTE中兴**

Master Supply Agreement Version 9/25/06

agreement and/or the performance by ZTE hereunder or during the installation, operation, and/or use by Customer of the Products and Software provided hereunder. Customer and ZTE expressly agree to maintain all such proprietary information and trade secrets in strict confidence, to take all precautions reasonably necessary to protect same from disclosure to third parties, and to not use such proprietary information or trade secrets for any purpose inconsistent with the Order and the transaction contemplated herein or otherwise to the detriment of ZTE or Customer. Proprietary information shall include, without limitation, technical, engineering or business or financial information or data conveyed in written, graphic, or other tangible form, or by oral conveyances, clearly identified as, or reasonably known to be, proprietary, confidential, or company private. All Product specifications, descriptions, computer programs, flowcharts, diagrams, manuals, schematics, development tools, design documents, business plans, business execution methods and prices comprise ZTE and or Customer proprietary information.

The foregoing confidentiality restrictions and obligations of the Customer, however, shall not extend to any part of the proprietary information which: (1) was already known to Customer without restriction as to its use at the time of its disclosure by ZTE as can be established by written documentation; (2) was known or was generally available to the public at the time of disclosure hereunder; (3) becomes known or generally available to the public (other than by act of Customer subsequent to its disclosure hereunder); (4) is disclosed or made available in writing to Customer without restriction by a third party having a bona fide right to do so; (5) is independently developed by Customer without the use of ZTE's proprietary information as can be established by written documentation; or (6) is required by law to be released (but only after prior written notice to ZTE providing ZTE with a reasonable opportunity to intervene to appropriately protect its information).

It is understood that breach or violation by Customer or ZTE of these confidentiality restrictions and obligations will cause irreparable harm to ZTE or Customer and ZTE or Customer shall accordingly have the right to enforce these obligations through injunctive relief and/or to obtain other appropriate remedies and relief, including the recovery of costs and attorney's fees. The provisions herein shall expressly survive the termination of this agreement.

18.   **Assignment**

In the absence of prior written consent of ZTE, which consent will not be unreasonably withheld, conditioned or delayed, Customer shall not assign this Agreement, any Purchase Order, or any of its rights and obligations hereunder. It is agreed that Customer can assign this agreement to any party purchasing or acquiring substantially all its assets in a given market except that if the acquiring party does not have the financial standing of Customer ZTE can request reasonable financial assurances including a Bank Letter of Credit covering outstanding balances or payment of such amounts. ZTE may assign any Purchase Order(s) and its rights and obligations hereunder (or may delegate the performance of its obligations) to any affiliated organization which in all respects is and

**ZTE中兴**

Master Supply Agreement Version 9/25/06

shall be bound by such obligations, it being understood that ZTE shall thereupon be released from any liability to Customer with respect to the subject matter of said assignment or delegation. Subject to the foregoing, the Purchase Order and the terms and conditions hereof shall pass to the benefit of, and be binding upon, the heirs, successors, administrators, executors and assigns of the parties.

### 19.    Infringement

ZTE agrees that it will defend at its own expense, all suits against Customer for infringement of any U.S. copyright, patent, or similar third party intellectual property right covering, or alleged to cover, ZTE designed and manufactured Products or Software in the form furnished by ZTE and ZTE agrees that it will pay all sums which, by final judgment or decree in any such suits, may be assessed against Customer on account of such infringement, provided that ZTE shall be given (a) immediate written notice of any claims of any such infringement and of any suits brought or threatened against Customer and (b) authority to assume the sole defense thereof through its own counsel and to compromise or settle any suits so far as this may be without prejudice to the right of the Customer to continue the use, as contemplated, of the Material furnished or to be furnished. If in any such suit so defended the Product or Software is held to constitute an infringement and its use is enjoined, or if in the light of any claim of infringement ZTE deems it advisable to do so, ZTE may procure the right to continue the use of the same for the Customer, or replace the same with non-infringing Product or Software, modify same so as to be non-infringing, or accept the return of Product or Software and refund the price paid therefor by Customer, less a reasonable adjustment for the Customer's prior beneficial use of the Product or Software and for wear and tear.

Customer agrees that the foregoing indemnification shall not apply, and moreover shall be extended to ZTE, under circumstances where the infringement claim is based on a requirement or usage by the Customer that is not normal in the industry and unknown to ZTE and is inconsistent with ZTE's standard published documentation governing the proper application and use of the Products or Software designed and manufactured by ZTE and supplied in fulfillment of Customer's order.

The defense and indemnification against infringement or related claims which cover any Products or Software supplied by but not of ZTE's manufacture or origination shall not be the responsibility of ZTE, but rather shall be the responsibility of the manufacturer or originator thereof to the extent that such an indemnity has been provided, which indemnity shall be conveyed and assigned to the Customer.

### 20.    Governing Law and Binding Arbitration

This Agreement shall be governed by the laws (without giving effect to its conflict of laws principles) of the State of Missouri; and nothing in this Agreement affects any statutory rights of consumers that cannot be waived or limited by contract. The parties

**ZTE中兴**

Master Supply Agreement Version 9/25/06

expressly disclaim the applicability of the United Nations Convention for the International Sale of Goods. Should any dispute, claim or controversy occur between the parties arising out of or related to this Agreement, one party may give written notice of the dispute to the other party.  The parties shall then, in the first instance, attempt to resolve such dispute or controversy in good faith by senior level negotiations between the parties without attorneys present with a view to resolving the dispute within a period of fifteen (15) business days from the day notice of the dispute was given (the "Resolution Period"). Such negotiations shall include a personal meeting of at least four (4) hours duration attended by the senior U.S. executive of each of the parties. If the parties are unable to resolve the dispute within the Resolution Period, either party may, within ten (10) business days after the end of the Resolution Period, initiate an arbitration proceeding which shall be administered by the International Centre for Dispute Resolution of the American Arbitration Association ("AAA") in accordance with its International Arbitration Rules. The place of arbitration shall be Jacksonville, Florida. The language of the arbitration shall be English. The parties to this Agreement expressly agree that any order or award of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction. Unless otherwise agreed in writing, the costs of any arbitration shall be shared equally between the parties.

**21.    Limitation of Liability**

**NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT ZTE SHALL NOT BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, REMOTE, OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO THE LOSS OF DATA, REVENUE OR PROFITS), EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, RESULTING FROM OR ARISING OUT OF ITS PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT, OR FROM ANY FAULT, FAILURE, DEFICIENCY, OR DEFECT IN THE PRODUCTS, SOFTWARE, AND/OR SERVICES, OR FROM THE USE OF OR THE INABILITY TO USE THE PRODUCTS, SOFTWARE AND/OR SERVICES EITHER SEPARATELY OR IN COMBINATION WITH OTHER EQUIPMENT OR SOFTWARE, OR FROM ANY OTHER CAUSE.**

**FURTHER, IN NO EVENT SHALL ZTE BE LIABLE UNDER ANY LEGAL THEORY OF RECOVERY OR FOR ANY OTHER REASON FOR LOSSES OR DAMAGES OF ANY KIND WHICH EXCEED THE PURCHASE PRICE PAID BY CUSTOMER HEREUNDER.**

**22.    Market Presence Provision**

In the unlikely event that ZTE or a successor thereof withdraws from and abandons the US market anytime within four (4) years (the "Period") following the date that Customer



issues its initial Purchase Order to ZTE hereunder, ZTE agrees to refund all moneys paid by Customer to ZTE under this Agreement during said Period up to the date of withdrawal.

**23.   Compliance with Laws**

Each party agrees to comply with all applicable laws, orders and regulations of all foreign, federal, state and local governmental authorities, including all applicable export and import laws and regulations.

**24.   Headings**

The headings appearing at the beginning of the several sections contained in this Agreement have been inserted for convenience only, and neither those headings, nor their order or placement, shall be used in the construction and interpretation of this agreement.

**25.   Severability**

If any provision of this agreement is determined to be invalid, illegal or unenforceable, such provision shall be severed from this agreement and the other provisions shall remain in full force and effect.

**26.   Waiver**

The failure of either party at any time to require performance by the other of any provision hereof shall not affect the right of such party to require performance at any time thereafter, nor shall the waiver of either party of a breach of any provision hereof be taken or held to be a waiver of a provision itself. No waiver or discharge hereof shall be valid unless in writing and signed by an authorized representative of the party against which such waiver or discharge is sought to be enforced.

**27.   Counterparts**

This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

**28.   Entirety of Agreement –Modifications to Schedules**

The provisions hereof are all of the terms, conditions and agreements of the parties regarding the sale of Products, and related Software Licenses and/or Installation Services



Master Supply Agreement Version 9/25/06

and take the place of any pre-printed provisions that may appear anywhere on Customer's Purchase Order, which provisions have been expressly rejected.  No modification(s) or amendments to these terms and conditions will be valid unless stated in writing and signed by duly authorized representatives of both ZTE and the Customer.  All schedules may be amended from time to time upon mutual consent of the parties to add deliverables and for other matters.

**ZTE中兴**

Master Supply Agreement Version 9/25/06

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed in their respective names.

**ZTE USA, Inc.**

By:

Name: Joey Jia

Title:  General Manager

**Daredevil  Inc. dba ClearTalk**

By:

Name:  Eric Steinmann

Title: Development Manager

15

**ZTE中兴**

## SCHEDULE 1

### DESCRIPTION OF PROJECT

Cleartalk will be leveraging ZTEs all IP CDMA 2000 platform to provide 1x,  EVDO REV A data and voice services in their Saint Louis marketNote: Cleartalk will be providing, DSX equipment, Voice Mail, Pre-paid subsystems in concert with ZTEs CDMA 2000 platform and aforementioned equipment. The ZTE all IP CDMA 2000 platform will be initially sized so Cleartalk can support 70,000 voice users with average of 2,000 minutes of use per month and this capacity will be guaranteed for  2 years from the commercial launch following the acceptance test.

16

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## SCHEDULE 2

## SHARE OF RESPONSIBILITIES

~~See Attachment SOR~~

WILL BE THE SAME AS
ZTE'S DEPLOYMENT OF A NETWORK
FOR PTA FLA IN JACKSONVILLE

17

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## SCHEDULE 3

### BILL OF MATERIALS AND LIST OF DELIVERABLESSee attached

See Attachment "Cleartalk ZTE Pricing final.xls "

18

ZTE中兴

Date: 9/28/2002
Client (Customer):Cleartalk
Project Name: St.Louis

### Price Schedule for Daredevil St Louis CDMA Project

| NO. | Item | Qty | Unit Price($) | Price ($) | Delivery Dates |
|---|---|---|---|---|---|
| | Main Equipment | | | | |
| | | | | | |
| 1 | CDMA Mobile Communication BTS (AWS) - Qty for each BTS type to be verified by Cleartalk | | | | |
| 1.1 | SDR AWS **** S222 Indoor | 40 | $35,000 | $1,400,000 | |
| 1.2 | SDR AWS **** S222 Outdoor | 123 | $35,000 | $4,305,000 | |
| 1.3 | SDR AWS **** S222222 Outdoor | 16 | $50,000 | $800,000 | |
| | | 179 | | | |
| 2 | ** Battery Backup**** | | | | |
| | Battery Backup for S111111/S222222 site - Outdoor /4 hours | 16 | $2,278 | $36,448 | |
| | Battery Backup for S111/S222 site - Outdoor | 163 | $1,846 | $300,898 | |
| | | | | | |
| 3 | * Services (project management and installation of core equipment) | 1 | $149,000 | $149,000 | |
| | Project Management | | $50,000 | | |
| | Installation of Core Equipment | | $49,000 | | |
| | System Integration | | $50,000 | | |
| 4 | OMM  Supervisory SubSystem | 1 | $1,120 | $1,120 | " |
| | Equipment Price CIF (** port in US) | | | $6,992,466 | |
| | Discounted Price | | | $5,500,000 | |
| | | | | | |
| litional core | | | | | |
| 5 | PDSN | 1 | $92,868 | $92,868 | " |
| 6 | MGW supports 120K users( 2000 mins) | 1 | $339,857 | $339,857 | |
| 7 | CDMA Mobile Communication BSC supports 120K users (2000 mins) | 1 | $287,180 | $287,180 | |
| | Subtotal | | | $719,905 | |
| | discounted Subtotal | | | $500,000 | |
| | | | | | |
| 8 | SDR AWS **** S222 Outdoor | 100 | $32,000 | $3,200,000 | |

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## SCHEDULE 4

## SPECIFICATIONS

~~See Attachment~~

*Same as for Jacksonville except for AWS*

10

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## SCHEDULE 5

## PRICE LIST

See Attachment  *Following*

*Schedule 3*

20

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## SCHEDULE 6

## TRAINING SCHEDULE

See Attachment

21

**ZTE中兴**

Master Supply Agreement Version 9/25/06

---

## SCHEDULE 7

## ACCEPTANCE TEST PROCEDURE

See Attachment "ACCEPTANCE TEST PROCEDURE – 3GCN and BSS"

Same as used in ZTE's prior deployment in Jacksonville, Florida

22

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## SCHEDULE 8

## VENDOR FINANCING AGREEMENT

$100,000 must be paid to ZTE upon issuance of the Customer Purchase Order for the entire initial project thereafter payments will be as set forth in Schedule 3 an further herein;

The remaining Ninety (90%) will be financed for a period of Three (3) years at an interest rate of LIBOR (LIBOR rate at the beginning of the year will apply for the full year). Default rates and charges shall be as described in **Paragraph 5 Payment Terms** of the Master Supply Agreement.  The accrual of interest on the indebtedness shall commence on and from the date (the "**Commencement Date**"), either the successful completion of testing pursuant to **Schedule 7 "Acceptance Test Procedure"**, or when fully functional commercial use of the Products is made by Customer whichever is earlier, or one (1) year following issuance by Customer of the initial Purchase Order to ZTE, if the network is at that time in commercial use and is reasonably functioning in the manner intended. Signing this agreement will constitute an initial  purchase order in accordance with Schedules 3 and 4.

The indebtedness of Customer shall be evidenced by a negotiable Promissory Note. Repayment shall be in twelve (12) equal quarterly installments over the term of the loan commencing with the quarter following the **Commencement Date**.

ZTE will retain a purchase money security interest in all equipment and other products sold to Customer until such time that the then outstanding total indebtedness of Customer to ZTE is is repaid.  On request ZTE will release parts of the equipment purchased from the security interest to reflect payments to date on this indebtedness.

At the time stated in Exhibit 3, Customer or its guarantors agrees to deposit with ZTE the sum of $2,000,000  USD which serves as a Guaranty of Payment securing all sums due and owing to ZTE by the Customer under the Vendor Financing Agreement.  It is understood that the further performance of ZTE's obligations under the Master Supply Agreement are conditioned upon receipt of this sum..  The $2,000,000 USD is agreed to be  converted to RMB at the spot rate of the transaction date and accrue interest at the Bank of China's rate of (2.52%) or spot rate of the transaction date – revised on the annual basis, or  for the period  remaining that it is required as collateral herein, if less. therafter retirement of this credit facility will  be in USD at the then spot rate on the retirement date. ZTE guarantees to return this facility in full in accordance with the provisions hereof if Customer has fulfilled its repayment obligations to ZTE in accordance with this  Vendor Financing Agreeemnt. This $2,000,000 should delivered within 1 week of the 50th BTS received.

22

**ZTE中兴**

Master Supply Agreement Version 9/25/06

## SCHEDULE 9

### Switch Room EQUIPMENT PROVIDED

- MSCe
- 1 service cabinet: 23.6" (W) x 31.5" (D)
- 1 server cabinet: 23.6" (W) x 37.4" (D)
  - HLRe
- 1 service cabinet
- 2 server cabinets
  - MGW
- 1 service cabinet (+1)
- 1 server cabinet
  - BSC
- 1 service cabinet (+1)
- 1 server cabinet
- PDSN
- SMSC
- Voicemail  (NONE ZTE)
- OTA
- Prepaid (NONE ZTE)
- MMS
- DSX/Transmission  (NONE ZTE)

Add in the drawing showing the switch layout and  power and heat requirements , and indicate future cabinets as future.

See Attachment "Switch Room Floor Plan & Power"



ZTE中兴

Master Supply Agreement Version 9/25/06

**SCHEDULE 10**

**Tennessee Market Budgetary Price**

See attachment "Budgetary Price_Tenn.xls"

N/A

案件：4:12-cv-01166-TIA   文件编号：44-1存档时间：2014年4月24日     页码：第1页，共2页     页面ID编号：755

AO 440 (Rev. 12/09) 民事诉讼传票

**美国密苏里东区**
**地区法院**

| | |
|---|---|
| Daredevil Corporation, Inc. | ） |
| *原告* | ） |
| 诉 | ） |
| 中兴通讯 | ） |
| *被告* | ） |

民事诉讼编号：4:12-CV-01166 TIA

**民事诉讼传票**

收件人：（*被告姓名与地址*） 中兴通讯
　　　　　　　　　　　　　中国深圳市
　　　　　　　　　　　　　南山区高新技术产业园
　　　　　　　　　　　　　科技南路中兴通讯大厦
　　　　　　　　　　　　　邮编 518057


　　　　　兹针对你提起一项诉讼。

　　　　　在本传票送达于你后21天内——送达之日不计算在内——或如你是《美国联邦民事诉讼规则》第12 (a)(2)或(3)条所述之美国政府或美国政府机构，或美国政府官员或雇员，则为60天——你必须根据《美国联邦民事诉讼规则》第12条向原告送达一份就随附起诉状作出的答辩或一份动议。答辩或动议必须送达原告或原告代表律师，其姓名与地址如下：　　John Grellner
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　5205 Lindenwood Ave.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　St. Louis MO 63109

　　　　　如你未能作出答复，将登录判你败诉、支持起诉状所主张之救济的缺席判决。你亦须将答辩或动议送交本院存档。

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*法院书记*

日期：_____　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　*书记或代理书记签名*

案件：4:12-cv-01166-TIA   文件编号：44-1 存档时间：2014 年 4 月 24 日    页码：第 2 页，共 2 页    页面 ID 编号：756

AO 440 (Rev. 12/09) 民事诉讼传票（第 2 页）

民事诉讼编号：4:12-CV-01166 TIA

## 送交证明

*（本页不应送交法院存档，除非《美国联邦民事诉讼规则》第 4 (l) 条有此要求）*

本人于（*日期*）_____接获该致（*人士姓名及职衔，如有*）_____之传票。

☐ 本人于（*日期*）_____ 在（*地点*）_____
_____将该传票面交送达该人士；或

☐ 本人于（*日期*）_____将该传票送往该人士住所或惯常居所，留交（*姓名*）_____（一位居住在此、具有适当年龄与判断力的人士），并向该人士最后为人所知的地址邮寄副本一份；或

☐ 本人于（*日期*）_____将该传票送达（*人士姓名*）_____，即依法被指定为（*机构名称*）_____接受送达法律程序文件之代表；或

☐ 传票未签收，原样交回，原因是_____；或

☐ 其他（*请说明*）：


本人收取交通费_____美元，送达费_____美元，合计____0.00____美元。

本人声明上述所言真实无讹，如有虚假，则以假证供罪论处。

日期：_____

_____
*送达人签名*

_____
*姓名及职衔（正楷填写）*

_____
*送达人地址*


有关送达试图的其他信息等：

案件: 4:12-cv-01166-TIA Doc. #: 6  提交时间：08/20/12 页码：第 1 页/共 12 页 PageID #: 73



**美国**
**密苏里州东部东区**
**联邦地方法院**

DAREDEVIL, INC.,　　　　　　　）
一家密苏里州公司，　　　　　　）
　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　）
原告，　　　　　　　　　　　　）
　　　　　　　　　　　　　　　）
诉　　　　　　　　　　　　　　）　　　案件编号4:12-CV-01166
　　　　　　　　　　　　　　　）
　　中兴通讯股份有限公司(ZTE　）
CORPORATION),　　　　　　　　）
　　　　　　　　　　　　　　　）
一家根据中国人民共和国法律注册成）
立的公司，　　　　　　　　　　）

　　　　　　　　被告。

**首次修订之索赔起诉状**

　　原告 Daredevil, Inc.("Daredevil")，一家密苏里州公司，通过其签字的律师针对被告中兴通讯股份有限公司 (ZTE Corp.)（"中兴通讯公司"），一家根据中国人民共和国法律注册成立的公司提出以下内容作为其首次修订后诉状：

**管辖权及各方**

　　1.　　Daredevil 是一家经营状况良好的密苏里州公司，其主要经营场所位于密苏里州圣查尔斯县 (St. Charles County, Missouri)。

　　2.　　中兴通讯公司(ZTE Corp.) 是一家根据中华人民共和国法律注册成立的公司，经核实，其已经在密苏里州圣路易斯县交易业务，该业务构成本诉状实质性内容。

　　3.　　法院根据 28 U.S.C. § 1332 正确行使管辖权。

　　4.　　审判地点正确无误。

```
附件

1
```

案例: 4:12-cv-01166-TIA Doc. #: 6   提交时间：08/20/12 页码：第 2 页/共 12 页 PageID #: 79

<u>一般指控</u>

**A. 协商**

　　5.　　在 2008 年之前，Daredevil 已经开始着手在密苏里州大都市区的圣路易斯建立一个蜂窝电话网络（"密苏里网络"）。

　　6.　　当时有一家与之竞争的蜂窝电信供应商也在准备进入圣路易斯市场，为了在圣路易斯地区的竞争中获胜，Daredevil 必须在一定截止期限内开发出密苏里州网络。

　　7.　　就这方面来说，Daredevil 需要先于其竞争对手推出[1]其网络，或者至少与其竞争对手同时推出。

　　8.　　如果 Daredevil 不能在截止时间内完成，它将无法实现有效竞争，密苏里网络的推出也可能无法盈利。

　　9.　　最初，Daredevil 并未考虑在其开发密苏里州网络的过程中使用中兴通讯公司制造的设备。

　　10.　　尽管有上述情况, 中兴通讯 (ZTE Corp.)、中兴通讯美国公司 (ZTE USA, Inc.)（"中兴通讯美国"）、中兴通讯全资美国子公司（统称"中兴"）的代表努力与 Daredevil 建立关系，以促使 Daredevil 购买并使用中兴通讯公司制造的设备。

　　11.　　Neil Kushner ("Kushner") 和 Joey Jia ("Jia") 这两个人主要负责中兴通讯和中兴通讯美国拉拢 Daredevil 业务的工作。

　　12.　　为了促使 Daredevil 购买中兴通讯公司制造的设备并用于密苏里网络, Kushner 和 Jia 做出了有关中兴通讯公司及时提供设备的能力的肯定性陈述，并声明如果中兴通讯公司未能在一定截止期限内达到要求，中兴通讯公司愿意在有利于 Daredevil 的情况下实施绝对的财务优惠。

　　13.　　中兴通讯公司还向与访问中兴通讯公司手机及其他设备的 Daredevil 及其附属公

---

[1]推出网络指的是电信运营商的网络通过电话销售和服务为消费者提供零售的过程。.

司做出了数项其他陈述，即建立合资公司来开发软件以便让 Daredevil 及其附属公司可以创建能够差异化竞争的应用程序并在未来通过销售这些应用程序而受益，雇佣 Daredevil 的附属公司作为经销商、网络开发商和其设备未来销售的安装方，并允许此类附属公司相应地从此类未来销售中获益。

**B.    密苏里协议**

14.    因此，在 2008 年 9 月 25 日左右，经过一系列协商之后，作为协议一方的 Daredevil 与作为协议另一方的中兴通讯和中兴通讯美国签订了一份协议，其中就管理设备购置和双方合作做出了相关规定（"密苏里协议"）。《密苏里协议》的真实正确复件作为附件 "A" 附于本文件后。

15.    《密苏里协议》明确规定，"中兴将以任何合理的方式进行合作，以便跨越这两家公司所在国的边境建立一个紧密的团队工作环境。"

16.    根据《密苏里协议》条款规定，Daredevil 和中兴通讯公司约定，圣路易斯网络将包括配置有至少一个声道和一条 EVDO Rev A 载波的 179 个基站和室内不用换热的 30 个基站（"密苏里设备"）。

17.　　根据《密苏里协议》规定，Daredevil 同意支付中兴通讯公司 2,600,000 美元的首期付款。双方进一步约定，Daredevil 将 (a) 从 Daredevil 的网络用户超过 30,000 名的季度之后开始，每季度分期支付给中兴通讯公司额外的 3,000,000.00 美元， (b) 要求 Daredevil 以预定价格从中兴通讯公司购买更多基站。双方遵守 $3,000,000.00 美元的付款以及作为 "按增长付费" 规定的额外购买要求。

18.　　中兴通讯公司同意按照以下时间进度表将密苏里设备交付至圣路易斯：

　　　　a.　　2008/10/30– 179 个配电电缆束；所有安装硬件和支架；用于 15 个站点的增压室；

　　　　b.　　2008/11/15– 其余的配电电缆束；所有站点的电池柜；墙/杆安装的安装硬件和支架；其余的核心网络组件；

　　　　c.　　2009/1/5– 第一批 20 个基站，包括 6 个分区基站；以及

　　　　d.　　2009/1/31 – 其余 159 个基站。

19.　　中兴通讯公司还同意某些有利于 Daredevil 及其附属公司的某些附加条款，其中包括以下内容：

　　　　a.　　新产品协议：中兴通讯公司同意 "确保 [Daredevil] 访问中兴开发的所有新产品……包括 Petmobility、Amberwatch（可以追踪航空公司的 WIFI 使用和上网情况的 CDMA/WIFI 电话）……"（"新产品协议"）；

　　　　b.　　经销商协议：双方表示，在成功部署密苏里网络后，中兴通讯公司将 "雇佣 Daredevil 人员加入其新业务开发团队并按照行业规范支付 Daredevil 薪酬。" 此外，如果 Daredevil 是为中兴通讯公司争取新业务的主要一方，Daredevil 将有权在获得其工作的公平薪酬之外还获取合同约定的销售额的 5%……"（"经销商协议"）；

　　　　c.　　开发与安装协议：双方表示，Daredevil 将在中兴通讯公司的支持下开发并安装密苏里网络。如果 Daredevil 获得成功，双方同意 "中兴将赋予 Daredevil 在

其出售的其他业务上实施类似功能并因此获得薪酬的权利……"（"开发与安装协议"）;

　　d.　　手机供应商协议：中兴通讯公司同意作为 Daredevil 在运行……Daredevil 和 NTCH[一家附属公司]（包括德克萨斯州的 Flat Wireless）时的"主要手机供应商"。中兴通讯公司同意其将"根据可比特征匹配正在出售和可以提供给各当事人的任何其他手机的成本……"此外，该协议为中兴通讯公司制造的 C78 和 C79 型号手机提供了特定报价。（"手机供应商协议"）;

　　e.　　EVDO 设备供应商协议：中兴通讯同意向 Daredevil 出售"EVDO 数据卡……价格与比出售给其他电信运营商的价格相比高出最多 1 美分，且不得超过 $100 美元。"（"EVDO 设备供应商协议"）。

　　f.　　应用程序与软件开发合资公司：中兴通讯公司同意，"Daredevil 及其附属公司根据本协议开发的应用程序和任何软件，一旦在圣路易斯地区成功部署，则将被推广向中兴的未来客户。"

20. 最后，中兴通讯公司同意，"如果 Daredevil 对其已经表现出的合作努力不满意……[Daredevil] 可以将与中兴在中国的三位高级管理人员的会议连续升级至更高级别以解决这一问题，最高级别是中兴通讯的最高级管理人员。"

21. 中兴通讯公司同意，《密苏里协议》规定的 Daredevil 的首期付款义务已经履行，因为中兴通讯公司依然欠 Daredevil（或隶属于 Daredevil 的多方）款项，该欠款数额超过了首期付款金额。《密苏里协议》的最后一页是单独确认的单页协议，承认其欠隶属于 Daredevil 的某些个人或实体（包括 Eric Steinmann、PTA-FLA, Inc.和 NTCH, Inc.）。同一页还确认，所欠的债务应用于支付《密苏里协议》规定的 Daredevil 首期付款义务，因此 Daredevil 的付款义务得到履行。

22. 《密苏里协议》的最后一句阐明"包含其他条款。如果出现任何冲突，以 [密苏里协议] 为准。"双方还执行了一份"主供应协议"（"密苏里 MSA"），该协议旨在提供《密苏里协议》的补充条款。《密苏里 MSA》的真实正确复本作为附件 "B" 附在本文件后。


**C. 违反《密苏里协议》**

23. 中兴通讯公司未能及时交付密苏里设备。

24. 经核实，就在密苏里设备某些交付日期即将到期不久前，中兴通讯公司决定将密苏里设备的这些部分交付给中兴通讯公司的另一个客户。

25. 中兴通讯公司从未将密苏里设备的绝大部分交付给 Daredevil。

26.　经核实，中兴通讯公司迫使中兴通讯美国扣留手机，且不参与《密苏里协议》中概述的任何合资企业。

27.　由于中兴通讯公司未能将密苏里设备交付给 Daredevil，Daredevil 失去了开发密苏里网络的机会。

28.　中兴通讯公司确实将部分有限的设备交付至 Daredevil 并且 Daredevil 进行了安装。但由于中兴通讯公司未能及时交付密苏里设备的剩余部分，该设备失去用处。

29.　因为中兴通讯公司未能交付所有密苏里设备，Daredevil 被迫停运其已经安装在密苏里的设备。

30.　Daredevil 产生的与安装并停运中兴通讯公司已交付设备有关的巨额成本与开支。

31.　Daredevil 产生并将继续承担为安置未交付的密苏里设备所订立的商业租约的租金开支。

32.　在相关的任何时候，中兴通讯公司都了解，Daredevil 要求及时交付密苏里设备从而成功开发 Daredevil 的密苏里网络。

33.　因为 Daredevil 失去了开发密苏里网络的机会，Daredevil 承受超过 2,600,000 美元的损害（包括失去的盈利），此外其还在该市场上损失了超过 7,000,000 美元的开发成本。

34.　提起本诉讼之前应符合的条件均已发生、满足或放弃。

<u>理由一</u>
（违反《密苏里协议》）

35.　　Daredevil 重申以上第 1 段至第 34 段，并通过该引用在此将其并入本文件。

36.　　Daredevil 直接与中兴通讯公司签约，执行《密苏里协议》。作为选择性抗辩，经核实，中兴通讯美国资金不足且为中兴通讯公司的另一个代表，因此坚持两者之间的任何法律上的区别会导致对 Daredevil 的不公平。

37.　　根据《密苏里协议》，中兴通讯公司同意及时供应与 Daredevil 开发密苏里网络有关的密苏里设备。

38.　　《密苏里协议》还要求中兴通讯公司遵守多项合资企业条款。

39.　　《密苏里协议》要求，如果双方出现争议，中兴通讯公司做出某些非正式的争议解决努力（"IDR 规定"）。

40.　　中兴通讯公司未能及时交付密苏里设备即为违反《密苏里协议》。

41.　　如果中兴通讯公司拒绝将密苏里设备交付给 Daredevil，而是将设备交付给另一位客户，即因拒绝履行《密苏里协议》条款而进一步违反该协议。

42.　　Daredevil 在中兴通讯公司履行义务之前满足所有条件，除非此类义务未作要求或以其他方式得到豁免。

43.　　Daredevil 因中兴通讯公司违反《密苏里协议》而遭受损失，其中包括：

    a.      失去在圣路易大都会区开发蜂窝网络的机会继而遭受利润损失；

    b.      失去《新产品协议》的收益；

    c.      失去《经销商协议》的收益；

    d.      失去《开发与安装协议》的收益；

    e.      失去《手机供应商协议》的收益；

    f.      失去《EVDO 设备供应商协议》的收益；以及

    g.      失去《应用程序与软件开发合资企业》的收益。

44.    中兴通讯公司得知 Daredevil 援引"IDR 规定"，但中兴通讯公司未能履行其根据"IDR 规定"的义务，因此违反了中兴通讯公司诚实信用和公平交易的职责。

45.    中兴通讯公司继续拒绝偿还 Daredevil 为了购买密苏里设备所支付的款项。

因此，原告 Daredevil 公司恳请法院赞成其申述，对被告中兴通讯公司就原告超过 $2,600,000 美元的金钱损失以及利润损失、判决前利息、费用以及法院认为公正和恰当的所有此类救济做出判决。

<u>理由二</u>
<u>（欺诈）</u>

46.    Daredevil 重申以上第 1 段至第 45 段，并通过该引用在此将其并入本文件。

47.    中兴通讯公司的代表（包括 Jia）明确向 Daredevil 代表表示，中兴通讯公司可以按照《密苏里协议》中规定的交付日期将密苏里设备交付至密苏里州圣路易斯。

48.　Jia 知晓或充分肯定中兴通讯公司无法按照《密苏里协议》中规定的日期及时完成订单，或罔顾做出此类示意。

49.　中兴通讯美国的高管随后证实，Jia 不应向 Daredevil 表示中兴通讯公司可以在《密苏里协议》规定的日期内履行其交付义务。根据这些高管所说，在 Jia 就交付日期做出表示时，按照《密苏里协议》中规定的日期交付根本是不可能的。

50.　中兴通讯公司旨在让 Daredevil 在订立协议和开始构建其密苏里网络时依赖其作出的虚假陈述。

51.　Daredevil 订立《密苏里协议》时依赖中兴通讯公司的虚假陈述，导致其遭受损失。

52.　Daredevil 会依赖中兴通讯公司的虚假陈述是可以预见的。

53.　Daredevil 对中兴通讯公司虚假陈述的信赖是合理的。

54.　由于 Daredevil 对中兴通讯公司虚假陈述的信赖，Daredevil 遭受了损失。

55.　中兴通讯公司的虚假陈述是恶意的和/或罔顾 Daredevil 保证收取惩罚性赔偿的权利。

因此，原告 Daredevil 公司恳请法院批准其申述，对被告中兴通讯公司就原告超过 2,600,000 美元的金钱损失以及利润损失、判决前利息、公平合理的惩罚性赔偿、费用以及法院认为公正和恰当的所有此类救济做出判决。

## 理由三
### （不正当获利）

56.　Daredevil 重申以上第 1 段至第 55 段，并通过该引用在此将其并入本文件。

57.　作为选择性抗辩，原告要求针对中兴通讯公司的不正当获利获取赔偿。

58.　Daredevil 根据《密苏里协议》规定向中兴通讯美国和/或中兴通讯公司支付了超过 2,600,000 美元。

59.　经核实，中兴通讯公司已经分享或保留了与出售密苏里设备给 Daredevil 有关的所有收入。

60.　中兴通讯公司增值、变现和持有上述来自 Daredevil 付款的收益。

61.　尽管 Daredevil 一再要求,中兴通讯公司未能并拒绝且一再拒绝归还 Daredevil 支付给中兴通讯公司的款项，并未能给与 Daredevil 任何与此款项有关的收益。

62.　中兴通讯公司已经通过收取 Daredevil 与《密苏里协议》有关的款项收益从 Daredevil 所付费用中获得了不当收益，且未能并拒绝执行和/或退还款项。

因此，原告 Daredevil 公司要求批准其申述，对被告中兴通讯公司判决 2,600,000 美元的金额以及判决前利息、费用以及法院认为公正和适当的此类其他救济。

<u>理由四</u>
（侵权干扰合同）

63.　　Daredevil 重申以上第 1 段至第 34 段，并通过该引用在此将其并入本文件。

64.　　作为选择性抗辩，中兴通讯公司对原告与中兴通讯美国之间的合同产生了侵权干扰。

65.　　Daredevil 和中兴通讯美国之间以《密苏里合约》的形式存在有效且可执行的合同。

66.　　中兴通讯公司知晓《密苏里协议》的存在。

67.　　中兴通讯公司有意、恶意且通过错误手段导致中兴通讯美国违反了《密苏里协议》。

68.　　中兴通讯公司无正当理由导致中兴通讯美国违反《密苏里协议》。

69.　　Daredevil 因中兴通讯公司侵权干扰《密苏里协议》而遭受损失，其中包括：

　　　　a.　　失去在圣路易大都会区开发蜂窝网络的机会继而遭受利润损失；

　　　　b.　　失去《新产品协议》的收益；

　　　　c.　　失去《经销商协议》的收益；

　　　　d.　　失去《开发与安装协议》的收益；

　　　　e.　　失去《手机供应商协议》的收益；

　　　　f.　　失去《EVDO 设备供应商协议》的收益；以及

　　　　g.　　失去《应用程序与软件开发合资企业》的收益。

70.　中兴通讯公司的行为属于恶意行为，且罔顾 Daredevil 根据审判裁定的金额要求征收惩罚性赔偿的权利。

因此，原告 Daredevil 公司要求法院批准其申述，对被告中兴通讯公司判决超过 2,600,000 美元的金钱赔偿，连同损失收益、判决前利息、审判裁定的惩罚性赔偿、费用以及法院认为公正和适当的此类其他救济。

敬呈，

STINSON MORRISON HECKER LLP

提交人：*/s/John C. Grellner* _____
　　　John C. Grellner, #50638MO
　　　7700 Forsyth Boulevard, Suite 1100
　　　St. Louis, Missouri 63105
　　　电话：314-863-0800
　　　传真：314-863-9388
　　　jgrellner@stinson.com

原告 Daredevil Inc. 律师

## 协议

所附协议条款在中兴和 Daredevil Inc.（一家密苏里州公司）之间生效，与圣路易斯市场有关的所有义务均属于 Daredevil Inc.。

中兴将提供网络基础设施、手机以及一家合资公司以便与 Daredevil 在圣路易斯市场共同开发应用程序。

中兴将以任何合理的方式提供合作，以便实现双向通讯进程，满足通讯需求，并建立跨越这两家公司所在国之间边界的紧密的团队工作环境。中兴将提供进行圣路易斯部署所需的任何资源（包括 NRE）以及中兴和 Cleartalk 组成的圣路易斯团队所采用的任何应用程序从而取得空前的成功。加入这一企业的人员成本将按照向其支付工资的金额向该企业收取。如果 Daredevil 及其附属公司开发的应用程序及任何软件在圣路易斯地区成功部署，则将被推广给中兴的未来客户。针对美国市场的联合应用程序开发工作将于 2008 年 11 月中旬伴随着 Daredevil 的开发经理对中国的访问而开始。如果 Daredevil 对中兴为达到这一联合应用程序开发工作目标所展现出的合作努力不满意，他们可以将与中兴的三位中国的高级管理人员的会议持续升级以解决这一问题，会议的最高级别是中兴的最高级管理人员。自 2009 年 1 月 1 日起，每周一次的工作进度会议（包括美国和中国团队）将通过托管呼入号码（由中兴托管，中兴将为此构建国内外桥梁）进行，本协议的所有方面都可以在这些会议上与来自任何相关公司的相关工作人员进行讨论，但前提是这些讨论事项至少在既定会议开始前两天就添加到该会议议程上。

在中兴可能与其他公司签订的 NDA 范围内，中兴将与 Daredevil 合作以确保 Daredevil 可以访问中兴出于其他动机开发的新产品，其中包括 Petmobility、Amberwatch、可以追踪航空公司的 WIFI 使用及上网情况的 CDMA/WIFI 电话（最后向客户介绍 Aircell 提供方）。

在成功部署圣路易斯市场且 Daredevil 获得了超过 60,000 名用户之后，中兴将开始雇佣 Daredevil 工作人员作为其新的业务开发团队其中一部分并根据行业规范针对这些人员的工作向这些人员支付薪酬。如果 Daredevil 或其附属公司是中兴争取新业务的主要一方，Daredevil 在为其工作人员获取公平合理薪酬之外，还可以获得合同约定的销售额的 5%，而中兴也会合理批准这些销售合同，前提是这些合同与中兴同除 Daredevil 以外的其他公司签署的其他合同条款基本类似。Daredevil 将与中兴同时获得这一薪酬。此安排有效期将为 3 年；如果取得成功，双方都将在合理范围内尽最大努力将这一安排延期。这不包括 NTCH 集团的现有运营公司。

附件
A

**ZTE中兴**

日期  8/21/2007

客户：Cleartalk

项目名称：圣路易斯

## Daredevil 圣路易斯 CDMA 项目价目表

交付日期　　（在特定美国码头，可能需要额外的清关时间）

| 编号 | 货物 | 数量 | 单价（美元） | 价格（美元） | 交付日期 |
|---|---|---|---|---|---|
| | 主要设备 | | | | |
| 1 | CDMA 移动通讯 BSC 支持 25K 用户（2000 分钟） | 1 | $287,180 | $287,180 | 2007 年 12 月.15 日 |
| 2 | 每月确定的 AWS 手机设备 | | | | 2008 年 2 月.1 日 |
| | | | | | |
| 3 | CDMA 移动通讯 BTS 及备用电池 | | | | |
| 3.1 | CBTS 01 60W **** S111 户外 | 40 | $36,918 | $1,476,720 | 2007 年 12 月.15 日 |
| 3.2 | BTSB I4 40W****S111111 室内 | 40 | $47,300 | $1,892,000 | 2007 年 12 月.15 日 |
| 3.3 | CBTS I2 60 W **** S111 室内 | 5 | $31,968 | $159,840 | 2007 年 12 月.15 日 |
| 3.4 | CBTS 01 60 W **** S222 户外 | 15 | $42,114 | $631,710 | 2007 年 12 月.15 日 |
| 3.5 | BTSB I4 40W ****S222222 室内 | 15 | $60,530 | $907,946 | 2007 年 12 月.15 日 |
| 3.6 | CBTS I2 60 W****S222 室内 | 5 | $37,114 | $185,570 | 2007 年 12 月.15 日 |
| 3.7 | CBTS 01 60W****S111111 户外 | | $58,900 | | |
| | | | | | |
| 3.4 | ** 备用电池**** | | | | |
| | 美国电源，BTSB I4 站点（只用于轻载器） | 55 | $3,278 | $0 | 2007 年 12 月.15 日 |
| | 美国电源，CBTS 01 站点 | | | | |
| | 美国电源，CBTS I2 站点（只用于轻载器） | 10 | $2,846 | $0 | 2007 年 12 月.15 日 |
| | 美国电源，中央室 | | | | |
| | 电池 | 65 | $4,000 | $0 | |
| 4 | CDMA 移动通讯 MSS | 1 | | | |
| 4.1 | MSCe 支持 120K 用户（2000 分钟） | 0 | $195,265 | $0 | 2007 年 12 月.15 日 |
| 4.2 | MGW 支持 25K 用户（2000 分钟） | 1 | $339,857 | $339,857 | 2007 年 12 月.15 日 |
| 4.3 | HLR 支持 120K 用户（2000 分钟） | 0 | $249,213 | $0 | 2007 年 12 月.15 日 |
| | | | | | |
| 5 | PDSN supports 6k 1x data users ***** | | $92,866 | $0 | 2007 年 12 月.15 日 |
| 6 | SMS/MMS/WAP ***** | 1 | $611,850 | $120,000 | 2007 年 12 月.15 日 |
| 7 | OTA | 0 | $204,493 | $0 | 2007 年 12 月.15 日 |
| | | | | | |
| 8 | 铬酸标准行案备件 | 1 | 备 | | |
| 9 | 交换机标准行案备件 | 1 | 备 | | |
| 10 | OMM 监控字系统 | 1 | $1,120 | $1,120 | 2007 年 12 月.15 日 |
| | 设备价格 CIF（美国** 码头） | | | $6,001,943 | |
| | | | Micro BTS | $136,000 | |
| | | + | FL 升级 | $0 | |
| | | | | $5,845,943 | |
| | | | | | |
| 11 | 服务（项目管理及核心设备安装） | 1 | $550,000 | $550,000 | |
| | | | | | |
| | 总价 | | | $6,395,943 | $53.30 |

中兴保密文件

有效期至：11/19/2007

日期 8/21/2007
客户：Cleartalk
项目名称：圣路易斯

## Daredevil 圣路易斯 CDMA 项目价目表

交付日期　　（在特定美国码头，可能需要额外的清关时间）

| 编号 | 货物 | 数量 | 单价（美元） | 价格（美元） | 交付日期 |
|---|---|---|---|---|---|
| | 主要设备 | | | | |
| 1 | CDMA 移动通讯 BSC 支持 25K 用户（2000 分钟） | 1 | $138,074 | $138,074 | 2007 年 12 月 15 日 |
| 2 | 每月确定的 AWS 手机报价 | | | | 2007 年 2 月 1 日 |
| 3 | CDMA 移动通讯 BTS 及备用电池 | | | | |
| 3.1 | CBTS 01 60W **** $111 户外 | 32 | $33,562 | $1,073,984 | 2007 年 12 月 15 日 |
| 3.2 | BTSB I4 40W ****$111111 室内 | 0 | $43,000 | $0 | 2007 年 12 月 15 日 |
| 3.3 | CBTS 12 60 W **** $111 室内 | 0 | $29,062 | $0 | |
| 3.4 | CBTS 01 60 W **** $222 户外 | 0 | $38,286 | $0 | |
| 3.5 | BTSB I4 40W **** $222222 室内 | 0 | $59,027 | $0 | 2007 年 12 月 15 日 |
| 3.6 | CBTS 12 60 W **** $222 室内 | 0 | $33,786 | $0 | 2007 年 12 月 15 日 |
| 3.7 | CBTS 01 60W****$111111 户外 | 0 | $53,545 | $0 | |
| | MBTS 20W 配有 2 RF 头 **** S1 户外 | 29 | $22,227 | $644,583 | |
| | EVDO 升级 | 16 | $5,000 | $80,000 | |
| 3.4 | ** 备用电池**** | | | | |
| | 夹国电池，BTSB I4 站点（只用于整流器） | 0 | $3,278 | | 2007 年 12 月 15 日 |
| | 夹国电池，CBTS 01 站点 | | | | |
| | 夹国电池，CBTS 12 站点（只用于整流器） | 0 | $2,846 | $0 | 2007 年 12 月 15 日 |
| | 夹国电环，中央室 | | | | |
| 4 | CDMA 移动通讯 MSS | 1 | | | |
| 4.1 | MSCe 支持 180K 用户（2000 分钟） | 1 | $292,898 | $292,898 | 2007 年 12 月 15 日 |
| 4.2 | MGW 支持 25K 用户（2000 分钟） | 1 | $141,414 | $141,414 | 2007 年 12 月 15 日 |
| 4.3 | HLR 支持 180K 用户（2000 分钟） | 1 | $373,820 | $373,820 | 2007 年 12 月 15 日 |
| 5 | PDSN | 1 | $92,868 | $92,868 | 2007 年 12 月 15 日 |
| 6 | SMS/MMS/WAP | 0 | $25,000 | $0 | |
| 7 | OTA | 0 | $204,493 | $0 | 2007 年 12 月 15 日 |
| 8 | 获取标准行业备件 | 1 | 客 | | |
| 9 | 交换机标准行业备件 | 1 | 客 | | |
| 10 | OMM 监控子系统 | 1 | $1,120 | $1,120 | 2007 年 12 月 15 日 |
| | 设备价格 CIF（美国** 码头） | | | $2,838,761 | |
| 11 | 服务（项目管理及核心设备安装） | 1 | $100,000 | $100,000 | |
| | 价格 20 K -I | | | $2,938,761 | |
| | 价格 25 K -K | | | $1,556,586 | |
| | 价格 15 K -G | | | $1,294,757 | $5,790,104 |
| | 价格圣路易斯 | | | $6,395,943 | $5,525,104 |
| | 总价 | | | $12,186,047 | |
| | | | | $265,000 | EVDO 价格 |
| | | | | $11,921,047 | w/o EVDO |

中兴保密文件　　　　　　　　　　　　　　　　有效期至：11/19/2007

关于在圣路易斯的部署工作，Daredevil 将作为主要责任方完成整合以外的安装工作所有方面并完成网络核心部分的工作（交换机 PDSN、AAA、HLR、SMSC、MMSC、OTA 等）。如果这一工作顺利完成，中兴将给予 Daredevil 在其出售的其他业务上实施类似功能的权利并为此支付给 Daredevil 薪酬，但前提是 Daredevil 向中兴提供具有竞争优势的报价。在执行本协议之后，Daredevil 将会向中兴公开所有的 RF 规划材料，以便让中兴可以就此提供建议。

圣路易斯网络将最初由 179 个分布式软件定义基站（在最初承诺的 279 个基站之外）构成，中兴向 Daredevil 提供的随附产品规格将对这些基站进行进一步说明。这些基站基本配置有至少 1 条声道和一条 EVDO Rev A 载波，并将包括不会在室内使用时产生生热交换的 30 个 BTS。中兴将负责随时为满足 Daredevil 的功能需要对这些 BTS 进行任何及所有功能（附加载波和/或频道组件）升级，最多可为既定 BTS 的每个分区提供三条混合声道和/或数据载波。对于各 BTS 上超过 3 条的任何载波，如果 Daredevil 将来获得更多频谱，则将对跨蜂窝基站所有分区的载波进行升级并为此向 Daredevil 收取 6,000 美元。如果 Daredevil 想要部署最多 16 个分区站点，Daredevil 将在交付时为每个六分区站点支付额外的 15,000 美元，而中兴将提供所需的技术支持以便让这些六个分区站点在网络中正常工作。

整个初始部署的总价格为首次付款 260 万美元。本初始合同的余款为 300 万美元，并将于 Daredevil 在圣路易斯的付费客户超过 30,000 名之后的一个季度开始按季度支付。在 Daredevil 达到 30,000 名用户额后的第一个季度，Daredevil 将在该季度结束 15 天内将其常规计划数目内的付费用户上报给中兴，并在上报后 15 天内针对 30,000 名以外的此类用户每人支付 $100 美元。在之后的季度中，直到此款项完全付清之前，Daredevil 将根据用户数量进行类似报告与支付，如果出现超过上个季度数目的情况。以上做法将持续，如果存在足量付费用户，直到中兴已经获得 30,000 名付费用户之款项或 3,000,000 美元，才予以停止。

在以上述规定方式为初始订单进行付款后，Daredevil 将为圣路易斯 50,000 名以上的用户以及田纳西州杰克逊 20,000 名以上的用户进行每 5,000 名用户 85,000 美元的付款，这些付款针对的是附加网络功能（包括所有基站组件、核心网络所有部件或核心网络扩展以及除语音邮件以外的所有相关部件）。本协议中提到的所有用户均为普通用户，以每月 20 美元或更高金额的费率对 Daredevil 提供的一个方案进行付费。每位用户付款将按照华为过去在 El Centro California 安装的网络计费方式进行计算。

# ZTE 中兴 　　　　　　　主供应协议版本日期 2006 年 9 月 25 日

## 主供应协议

本主供应协议（"协议"）于 2508 年 9 月 25 日（"生效日期"）订立生效，订约双方如下：

ZTE USA, Inc.（"中兴"），其营业地位于 2425 Central Expressway, Suite 323, Richardson, TX 75080；与 PTA-FLA, Inc. dba ClearTalk（"客户"），其营业地位于 1356 South Fifth Street. St. Charles, Mo. 63301。

**鉴于**中兴是若干电信产品（*在本协议中定义为设备、硬件及相关材料，不包括软件内容*）、相关软件许可证和／或安装、工程和培训服务的制造商和／或供应商。

**鉴于**客户有意根据本协议所列条款和条件，向中兴采购本协议下文所述的各种产品、相关软件许可证和／或安装、工程和培训服务设备。

考虑到上述前提和本协议所载契诺，双方**特此**同意受如下约束：

## 1.　附表清单

一份或多份下列附表可能随附于本协议，须视作适用于及纳入本协议：

附表 1 "项目说明"
附表 2 "责任分担(SOR)"
附表 3 "物料清单和交付日期"
附表 4 "规格"
附表 5 "保证未来价格上限"
附表 6 "培训安排"
附表 7 "验收测试程序"
附表 8 "供应商融资协议"
附表 9 "已提供的交换室设备"
附表 10 "田纳西州市场预算价格"

> 附件
> **B**

1

# ZTE中兴

日期 8/21/2007
客户：Cleartalk
项目名称：圣路易斯

肯纳威克 CDMA 项目价目表

交付日期    （在特定美国码头，可能需要额外的清关时间）

| 编号 | 货物 | 数量 | 单价（美元） | 价格（美元） | 交付日期 |
|---|---|---|---|---|---|
| | 主要设备 | | | | |
| 1 | CDMA 移动通讯 BSC 支持 25K 用户（2000 分钟） | 1 | $142,441 | $142,441 | 2007 年 12 月15 日 |
| 2 | 每月确定的 AWS 手机租价 | | | | 2008 年 2 月1 日 |
| 3 | CDMA 移动通讯 BTS 及备用电路 | | | | |
| 3.1 | CBTS 01 60W **** S111 户外 | 20 | $33,562 | $671,240 | 2007 年 12 月15 日 |
| 3.2 | BTSB I4 60W ****SI11111 室内 | 0 | $43,000 | $0 | 2007 年 12 月15 日 |
| 3.3 | CBTS 12 60 W **** S111 室内 | 0 | $29,062 | $0 | 2007 年 12 月15 日 |
| 3.4 | CBTS 01 60W **** S222 户外 | 0 | $38,286 | $0 | 2007 年 12 月15 日 |
| 3.5 | BTSB I4 40W ****S222222 室内 | 0 | $59,027 | $0 | 2007 年 12 月15 日 |
| 3.6 | CBTS 12 60 W ****S223 室内 | 0 | $33,786 | $0 | 2007 年 12 月15 日 |
| 3.7 | CBTS 01 60W****SI11111 户外 | 0 | $53,545 | $0 | |
| 3.8 | MBTS 20W 配有 2 RF 头 ****ST 户外 | 15 | $22,227 | $333,405 | |
| | EVDO 升级 | 10 | $5,000 | $50,000 | |
| 3.4 | ** 备用电源**** | | | | |
| | 美国电源，BTSB I4 站点（只用于基础器） | 0 | $3,276 | $0 | 2007 年 12 月15 日 |
| | 美国电源，CBTS 01 站点 | | | | |
| | 美国电源，CBTS 12 站点（只用于基础器） | 0 | $2,846 | $0 | 2007 年 12 月15 日 |
| | 美国电源，中央室 | | | | |
| 4 | CDMA 移动通讯 MSS | 1 | | | |
| 4.1 | MSCe 支持 120K 用户（2000 分钟） | 0 | $292,898 | $0 | 2007 年 12 月15 日 |
| 4.2 | MGW 支持 25K 用户（2000 分钟） | 1 | $155,513 | $155,513 | 2007 年 12 月15 日 |
| 4.3 | HLR 支持 120K 用户（2000 分钟） | 0 | $0 | | 2007 年 12 月15 日 |
| 5 | PDSN | 1 | $92,868 | $92,868 | 2007 年 12 月15 日 |
| 6 | SMS/MMS/WAP | 0 | $25,000 | $0 | 2007 年 12 月15 日 |
| 7 | OTA | 0 | $204,493 | $0 | 2007 年 12 月15 日 |
| 8 | 站端标准行业备件 | 1 | 含 | | |
| 9 | 交换机标准行业备件 | 1 | 含 | | |
| 10 | OMM 监控子系统 | 1 | $1,120 | $1,120 | 2007 年 12 月15 日 |
| | 设备价格 CIF 美国** 码头） | | | $1,446,586 | |
| 11 | 服务（项目管理及核心设备安装） | 1 | $110,000 | $110,000 | |
| | 总价 | | | $1,556,686 | |

中兴保密文件                                         有效期至： 11/19/2007

# ZTE 中兴         主供应协议版本日期 2006 年 9 月 25 日

**2. 项目**

客户有意实施本协议**附表 1"项目说明"**中所述的电信项目（"该项目"）。就此，双方须按照本协议条款，履行**附表 2"责任分担(SOR)"**所述的某些各自的义务和任务。

**3. 设备、软件许可证和服务定购**

客户须及时向中兴发出采购订单或其他书面文件，以采购所需的产品、相关软件许可证和 / 或安装、工程和培训服务，此等物品包括**附表 3"物料清单和交货清单"**中所述物品，物品的相关规格（如有）如**附表 4"产品规格"**所述。

附表 3 中所反映的首次采购订单后的每张采购订单须待中兴接受及书面（包括电子邮件或传真）认收确认，如订单未得到及时认收，唯一的原因在于采购订单不符合本协议。此等产品、软件和 / 或安装、工程和培训服务的交付日期须依照**附表 2"责任分担(SOR)"或附表 3 所示安排**。发出和随后接受任何采购订单，或双方互相签立任何类似书面定购文件，须确立起客户与中兴之间按照和符合主供应协议和本协议附表条款和条件的购买协议。

**4. 价格**

首次订单后，后续产品、相关软件许可证和 / 或安装、工程和培训服务的价格以美元计算，且不得超过本协议**附表 5"保证未来价格上限"**中所列价格。如属在市场上有竞争力的产品，附表 5 中所列价格可从 2009 年 1 月 1 日开始每年最高上调 5%。

价格为 CIF，因此设备将被交付至客户选择的最近的美国港口，但中兴或须支付美国国内运输费用、非标准包装和任何适用的销售税或其他类似征税。所有此等额外的分项收费由客户偿付中兴。



2

**ZTE中兴**

日期 8/21/2007

客户：Cleartalk

项目名称：圣路易斯

### 大章克申 CDMA 项目价目表

交付日期　　（在特定美国码头，可能需要额外的清关时间）

| 编号 | 货物 | 数量 | 单价（美元） | 货格（美元） | 交付日期 |
|---|---|---|---|---|---|
|  | 主要设备 |  |  |  |  |
| 1 | CDMA 移动通讯 BSC 支持 25K 用户（2000 分钟） | 1 | $134,632 | $134,632 | 2007 年 12 月 15 日 |
| 2 | 每月确定的 AWS 手机报价 |  |  |  | 2008 年 2 月 1 日 |
| 3 | CDMA 移动通讯 BTS 及备用电池 |  |  |  |  |
| 3.1 | CBTS 01 60W ****S111 户外 | 18 | $33,562 | $604,116 | 2007 年 12 月 15 日 |
| 3.2 | BTSB I4 40W ****S111111 室内 | 0 | $43,000 | $0 | 2007 年 12 月 15 日 |
| 3.3 | CBTS I2 60 W ****S111 室内 | 0 | $29,062 | $0 | 2007 年 12 月 15 日 |
| 3.4 | CBTS 01 60W ****S222 户外 | 0 | $38,286 | $0 | 2007 年 12 月 15 日 |
| 3.5 | BTSB I4 40W****S222222 室内 | 0 | $39,027 | $0 | 2007 年 12 月 15 日 |
| 3.6 | CBTS I2 60 W****S222 室内 | 0 | $33,786 | $0 | 2007 年 12 月 15 日 |
| 3.7 | CBTS 01 60W****S111111 户外 |  | $53,545 |  |  |
| 3.8 | MBTS 20W 配有 2 RF 实 ****S1 户外 | 0 | $22,227 | $200,043 |  |
|  | EVDO 升级 |  | $5,000 | $45,000 |  |
| 3.4 | ** 备用电池**** |  |  |  |  |
|  | 美国电源，BTSB I4 站点（只用于整流器） | 0 | $3,278 | $0 | 2007 年 12 月 15 日 |
|  | 美国电源，CBTS 01 站点 |  |  |  |  |
|  | 美国电源，CBTS I2 站点（只用于整流器） | 0 | $2,846 | $0 | 2007 年 12 月 15 日 |
|  | 美国电玻，甲央室 |  |  |  |  |
| 4 | CDMA 移动通讯 MSS | 1 |  |  |  |
| 4.1 | MSCe 支持 120K 用户（2000 分钟） | 0 | $292,898 | $0 | 2007 年 12 月 15 日 |
| 4.2 | MGW 支持 25K 用户（2000 分钟） | 1 | $126,979 | $126,979 | 2007 年 12 月 15 日 |
| 4.3 | HLR 支持 120K 用户（2000 分钟） | 0 | 0 | $0 | 2007 年 12 月 15 日 |
| 5 | PDSN | 1 | $92,868 | $92,868 | 2007 年 12 月 15 日 |
| 6 | SMS/MMS/WAP | 0 | $25,000 | $0 | 2007 年 12 月 15 日 |
| 7 | OTA | 0 | $204,493 | $0 | 2007 年 12 月 15 日 |
| 8 | 插架标准打夹备件 | 1 | 含 |  |  |
| 9 | 交换机标准打夹备件 | 1 | 含 |  |  |
| 10 | OMM 监控子系统 | 1 | $1,120 | $1,120 | 2007 年 12 月 15 日 |
|  | 设备价格 CIF（美国** 码头） |  |  | $1,204,757 |  |
| 11 | 服务（项目管理及核心设备安装） | 1 | $90,000 | $90,000 |  |
|  | 总价 |  |  | $1,294,757 |  |

中兴保密文件

有效期至：11/19/2007

1/1

- 2008 年 1 月 5 日，首批 20 个基站将运至圣路易斯，包括所有 6 个分区基站。
- 2008 年 1 月 31 日，其余的 159 个基站将运至圣路易斯。

除了本协议中购买的网络部件外，双方约定，中兴作为 Daredevil 在圣路易斯的公司以及 Daredevil 和 NTCH 的其他附属公司（包括德克萨斯州的 Flat Wireless）的主要手机供应商。就这方面来说，自此日期起 5 年内，中兴同意将正在出售并基于可比特征提供给其他方或在必要情况下所调整的任何其他手机成本与增加功能的新加 BOM 成本匹配。C79 直板手机的初始报价将按 100.01 美元向各方计价，但市场发展基金 (MDF) 对 20,000 部该型号手机的初始订单将按照 13 美元的价格提供给买方。类似地，C78 手机将以 140.01 美元的价格提供，其 MDF 金额为 28 美元。该型号收集的初始订单数量为 10,000 部。CMT 将被用于在 Cleartalk 品牌广告中宣传中兴手机。双方进一步合作，增强中兴手机阵容，提供适合使用双方正在开发的应用程序的新手机，但前提是此类应用程序展示出潜在的商业成功。如果中兴在该日期之前进口 EVDO 卡，EVDO 数据卡将在 2009 年 3 月底之前以高于出售给其他运输商的价格不超过 1 美分且不超过 100 美元的价格提供给 Daredevil。

上述内容主要列出了双方期待共同实施该项目并进行团队合作的期望与方式。但在此必须阐明，如果上述部件未能在规定的时间限制内提供（除非遇到自然灾害）并以合理方式运行，则可能造成一定的后果。如果所有上述部件未在规定的时间内按照良好执行的订单进行交付，Daredevil 则无需为交付的初始网络支付任何其他款项，且也无需购买附加的基站。如果 Daredevil 因未交付或故障设备而决定用另一网络取代该网络，中兴将按照已经付清的金额买回该网络，且支付最高 100 万美元的费用来卸载该网络。

本协议经过双方审核，本文件所使用语言不得以不利于起草方的方式进行解释。

法律选择。本协议将按照密苏里州法律进行解释，其产生的任何争议都属于密苏里州管辖权范围内。

中兴将在 18 个月的质保期内提供此网络的合理备用版本。在质保过期后的第一年和第二年开始时，在 Daredevil 选择为每个部署的基站支付 1,000 美元的基础上，中兴将提供任何延期质保。此后，Daredevil 须为每个部署的基站支付 2,000 美元。

　　Daredevil 承诺在此初始订单之后，将以每个基站 33,000 美元的定价再次购买至少 100 个基站（包括室内外配置中跨三个扇区的至少 1 条 EVDO REV A 载波和 1 条 CDMA 1×Voice 载波），并将在交付后 30 天内进行支付。Daredevil 将在 179 个基站的初始订单完全交付后 1 年内提交所有 100 个基站的订单。之后 Daredevil 可以在其认为每个基站 33,000 美元合理的情况下继续订购基站。如果 Daredevil 无法兑付 100 个基站的附加订单，而中兴完全遵守本协议并为 Daredevil 提供了良好运转的网络，购买的任何附加基站将采用 35,000 美元的价格并附加 358,000 美元的罚款。第一批此类基站的购买订单已附在本文件中。

　　圣路易斯启动的核心网络要求将一个 BSC 从田纳西州杰克逊移动到圣路易斯，而中兴提供另一个 BSC，同时中兴提供 Media Gateway 和 PDSN，并将其他主要辅助部件 MSCE、MMSC、SMSC、HLR 和 AAA 移动到圣路易斯。Daredevil 和/或 NTCH 之后将为杰克逊交换机提供信令中继以便在圣路易斯使用这些组件，或者购买 Primal box 以便在田纳西州杰克逊执行这些功能。在所有这些组件交付并正确运行且成功与 NTCH Smartbox 应用程序和计费平台进行集成后，Daredevil 将另外支付 600,000 美元。

　　本协议中 Daredevil 购买的所有部件付款后将由货船装运至圣路易斯港口，运费费用由中兴支付。如果 Daredevil 提前要求使用空运运送任何部件，空运费用将由 Daredevil 支付。

　　上述网络部件的交付日期安排如下：
- 在 2008 年 10 月 30 日之前，179 个配电电缆束包括两端终止且可以和独立的 RRU 一起用于屋顶安装或塔架安装的所有电缆（电缆束大部分运送至同一地址）中的 30 个（剩下的电缆束将于 11 月 15 日交付）将在圣路易斯交付给 Daredevil；在同一天，执行 RRU 早期安装的硬件和支架将在圣路易斯交付给 Daredevil。此外位于安装在楼板上的电池柜下方的充压室将交付到 15 个站点。
- 在 2008 年 11 月 15 日之前，真正的电池柜将连同安装在墙上或孔上的所有安装硬件和支架一起交付到所有站点。
- 在 2008 年 11 月 15 日之前，运输至圣路易斯的其余核心网络组件将在圣路易斯交付给 Daredevil。

其他条款都包含在本协议内。如果出现任何冲突，以此 5 页的初始协议为准。

日期 2008 年 9 月 25 日
【签名】
Daredevil  公司开发经理  Eric Steinmann
【签名】
中兴通讯公司总经理  Joey Jia

双方同意将对本协议完全保密。

如果华为在田纳西州、华盛顿州和爱达荷州市场将其已经对 NTCH 报出的价格提高（最高达到 500,000 美元），中兴将按照华为在此类其他市场上对 NTCH 提价的金额（如有）扣除 Daredevil 在圣路易斯对其所欠的金额。NTCH 将尽最大努力通过协商将此金额降至最低（如有）并向中兴提供此类协商的电子邮件记录，说明他们有理由采取此类措施。

Daredevil 圣路易斯市场上的存款金额目前属于 Eric Steinmann 和/或 PTA FLA, Inc.、NTCH Inc. 所有，这些实体在此同意将这一款项用于 Daredevil 圣路易斯的设备购买，且已经按照本协议由 Daredevil 进行了相应支付。

NTCH, Inc.、PTA Fla, Inc. 各自代表及职务
【签名】
开发经理 Eric Steinmann

中兴通讯美国公司(ZTE USA, Inc.)
【签名】
总经理 Joey Jia

# ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

**5.  付款条件**

产品、相关软件许可证和服务的全额买价及中兴的发票上分项列载的任何相关预付货运费、保险费和税项须按下列方式到期以美元支付：

> a) 客户在发出采购订单后支付总买价的 10%（详细内容参阅附表 3）；和

> b) 至于中兴发票开具的总购价的剩余 90%，在依据**附表 7"验收测试程序"**成功完成测试后，或客户在验收后将产品投入商业使用，或客户向中兴发出首次采购订单后一(1)年（如未因不适合预期功能而退货）三者中任一情况**首先发生时**，依据本协议**附表 8"供应商融资协议"**条文支付该发票金额。

然而，单一采购订单上超过 1,000,000 美元的任何进一步主系统采购将根据附表 8 的相同条文融资，但前提是 Cleartalk 不违背相关付款义务，且包括新的采购订单在内，欠付中兴的未清总额不得超过抵押资产或客户及其联营公司先前已支付中兴的金额的两倍。

1. 客户在发出采购订单后支付30%的首付款
2. 至于中兴发票开具的总购价的剩余70%，在依据**附表7"验收测试程序"**成功完成测试后，或客户在验收测试后将产品投入商业使用，或客户向中兴发出首次采购订单后一(1)年（如未因不适合预期功能而退货）三者中任一情况**首先发生时**，依据本协议**附表8"供应商融资协议"**条文支付该发票金额。

双方进一步理解和同意，所有无争议的逾期余额应按每月百分之一点五(1.5%)的利率（或如法律允许的最高利率较低，则按法律允许的最高利率）计息，客户须在要求下向中兴支付任何费用或成本，包括因收取任何逾期金额招致的合理的律师费。

**6.  交付**

中兴将按照其商业标准，将本协议下购买的产品包装付运，并将产品交付予中兴选择的承运人。价格为

3

# ZTE 中兴 　　　　主供应协议版本日期 2006 年 9 月 25 日

**5. 付款条件**

产品、相关软件许可证和服务的全额买价及中兴的发票上分项列载的任何相关预付货运费、保险费和税项须按下列方式到期以美元支付：

a) 客户在发出采购订单后支付总买价的 10%（详细内容参阅附表 3）；和

b) 至于中兴发票开具的总购价的剩余 90%，在依据**附表 7"验收测试程序"**成功完成测试后，或客户在验收后将产品投入商业使用，或客户向中兴发出首次采购订单后一(1)年（如未因不适合预期功能而退货）三者中任一情况**首先发生时**，依据本协议**附表 8"供应商融资协议"**条文支付该发票金额。

然而，单一采购订单上超过 1,000,000 美元的任何进一步主系统采购将根据附表 8 的相同条文融资，但前提是 Cleartalk 不违背相关付款义务，且包括新的采购订单在内，欠付中兴的未清总额不得超过抵押资产或客户或其联营公司先前已支付中兴的金额的两倍。

1. 客户在发出采购订单后支付30%的首付款
2. 至于中兴发票开具的总购价的剩余70%，在依据**附表7"验收测试程序"**成功完成测试后，或客户在验收测试后将产品投入商业使用，或客户向中兴发出首次采购订单后一(1)年（如未因不适合预期功能而退货）三者中任一情况**首先发生时**，依据本协议**附表8"供应商融资协议"**条文支付该发票金额。

双方进一步理解和同意，所有无争议的逾期余额应按每月百分之一点五(1.5%)的利率（或如法律允许的最高利率较低，则按法律允许的最高利率）计息，客户须在要求下向中兴支付任何费用或成本，包括因收取任何逾期金额招致的合理的律师费。

**6. 交付**

中兴将按照其商业标准，将本协议下购买的产品包装付运，并将产品交付予中兴选择的承运人。价格为

4

案件：4:12-cv-01166-TIA   文档 #:1-2 提交时间：06/28/12 页码：第 5 页/共 28 页 PageID #: 29

# ZTE 中兴
主供应协议版本日期 2006 年 9 月 25 日

若 Cleartalk 要求，中兴将按其从 Cleartalk 或其债务担保人收取的付款成比例地解除个别基站的这种抵押权益。

## 10. 软件许可证

中兴特此授予客户且客户接受使用包含已购软件许可证标的的软件的个人、非专用、不可转让和受限制的权利和许可证，且须进一步符合下列条文和限制：

(A) 本协议下提供的软件和任何支持文档供客户用于其自身的业务活动，仅适用本协议下购买的产品的正常和预期使用和操作，产品和软件共同构成许可系统；

(B) 从现在直至整个许可证期限，客户使用软件的权利视客户向中兴支付所有适用费用的情况而定；

(C) 许可使用限于中兴向客户交付的可执行软件，不论客户对软件的任何缺陷有何索赔，不允许修改软件或使用软件的任何修改形式；客户不得复制软件，但制作软件备份副本以在系统故障时使用则不在此限；

(D) 软件和提供的任何文档均为中兴财产，须被视为中兴专有信息；在本协议终止前后，客户不得向任何第三方以任何形式披露、提供或以其他方式使第三方取得软件或文档，或软件或文档的任何部分，但中兴书面同意的除外；若客户得知任何未经许可的当事人拥有软件或文档，客户须立即以书面形式通知中兴；客户须以最大的谨慎和努力保护上述软件和文档；

(E) 软件及其构成网络的系统的任何配置、应用或安排不得被视作所有权有别于客户所收软件的衍生产品；

(F) 正常使用软件产生、起初依赖软件执行的，以宏指令、测试用例、模拟数据形式或知识产权的类似形式的任何独特和单独软件成分，须被视为中兴保留所有权的衍生产品，而客户获得仅以其依赖形式及结合本协议下许可的软件和许可系统使用的专有权；

(G) 在本协议下向客户提供的软件采用目标代码格式；但需要修改软件以供市场运营的情况除外。中兴明确禁止，客户亦同意自身或代理人不得试图篡改、分解、反向编译、反向工程或以任何类似方式暴露软件内的实际指令序列、内部逻辑、协议、算法或软件内体现的其他知识产权，而不论上述知识产权是否包含在任何专利或版权中，中兴均将其视为自己的专有信息和商业秘密；从客户或任何其他方的此等工作衍生或产生出的任何成果，均须视为中兴财产，本协议对此概未授予客户使用权，中兴对此亦不负有任何支持义务；

5

Case: 4:12-cv-01166-TIA   Doc. #:  53-1   Filed: 02/26/15   Page: 87 of 109 PageID #: 923

# ZTE 中兴
主供应协议版本日期 2006 年 9 月 25 日

- (H)　该软件许可证及客户的权利和义务不得质押、抵押、出让、转授权或以其他形式转让或处置，包括客户全部或部分依法行事，除非中兴书面同意；但如属向终端用户转售许可系统或相关服务，客户有权依据所含条款与本协议所载大致相似的软件许可协议向该终端用户转授软件的使用权；

  - (I)　在客户维持使用软件运行所处的许可系统期间，本协议授予的许可证持续有效，除非客户拖欠应向中兴支付的任何付款，或违反本协议，或严重违反本协议的任何条款，或按照本协议的其他规定，本协议授予的许可证在中兴向客户发出有关书面通知后终止；许可证终止后，客户对软件的所有使用须立即停止，并立即将所有软件副本和相关文档归还中兴，费用由客户承担。

  - (II)　中兴同意仅具有访问有关客户用户的网络和信息的权限，在安装时由客户特别授权，并同意培训客户使用特定程序，使客户可以在不到 5 分钟内切断任何或所有外方的任何访问，而不影响网络运行。如客户选择由独立外部机构验证这一流程，结果发现不适合所述目的，中兴将支付有关此调查及修正流程以符合所述目的的所有费用。如发现网络的任何功能设计用于监视，或可供有意伤害客户、客户的客户、客户的国家的人禁用网络，如非明显无意，则客户可因此中止应付中兴的所有付款，并向本协议后文所述的争议解决职能部门提出申诉，如合理裁定该功能属蓄意或不可矫正，中兴将负责承担以客户所选网络替换该网络的成本。

## 11.　税项

产品、软件许可证和／或安装或培训服务的价格不包括适用于此交易的任何州、联邦、国家、县或地方销售、使用或消费税（或指定的其他税费、费用或类似收费），而客户明确同意向中兴支付（在指定价格以外）客户指定的装运目的地决定对中兴征收，因此中兴须支付的任何税项金额。除非客户的采购订单附有有效的免税证明或同等的法律豁免文件，否则中兴将就招致的任何适用税项、税费、费用和类似成本向客户开具账单。双方进一步理解，对客户为产品、软件许可证和／或安装或培训服务向中兴所做付款征收的任何和所有税项、关税或税费，完全由客户承担，不得从本协议下应付中兴的款项中扣减。即使前文有任何规定，客户无须承担对中兴的净收入征收或中兴须为此支付的任何税项。

## 12.　终止



6

# ZTE 中兴　　　　　主供应协议版本日期 2006 年 9 月 25 日

如客户根据《破产法》提出重组申请，或被判定破产，或已为客户的业务委任接管人，或客户为债权人的利益做出转让，或未能支付本协议下到期应付的任何无争议款额，中兴有权即时终止本协议，停止所有进一步履约行为，进入客户的处所，收回和带走在中兴享有的抵押权益范围内的任何物品及所有中兴拥有的产品和／或软件。中兴终止本协议或实施这种接管行为不会损害中兴可能具有的任何其他权利和救济。客户支付所有应计的中兴发票的义务在任何终止行动后仍然存在。唯有在客户对中兴当时的全部未偿负债依据**附表 8 "供应商融资协议"** 条款无法通过银行信用证全部无条件获得保证时及在此范围限度内，本段有关终止和收回的条文方具有效力和效用。

## 13. 保证条文

在符合本协议所载限制的情况下，保证中兴制造的产品（不包括中兴创作和供应的软件）符合中兴的标准公开商品规格，且从交付至客户之时起十八(18)个月期间内工艺和材料无缺陷。中兴保证，中兴创作和供应的软件在十八(18)个月期间内基本上可按照公布的中兴规范执行。声称出现缺陷的通知必须在保证期内以书面形式发出。由中兴供应，但并非由中兴制造或创作的任何产品或软件仅须符合其制造商或创作者的保证，该保证须向客户传达和让渡。该保证亦适用于客户为附件 1 所述目的购买的软硬件的合理运行。

中兴将维修、修正或更换其制造的任何有缺陷产品，或其创作和供应的有缺陷软件，或以新的或同等产品或软件进行更换，以使产品或软件符合该保证，但前提是：

(A) 如中兴提供包装材料并预付装运费用，应按照中兴的指示（包括须及时提供的退料授权(RMA)），按中兴指定的美国地点，向中兴退回有缺陷的产品或软件，预付的运输费和损失风险由客户承担；



7

# ZTE 中兴
主供应协议版本日期 2006 年 9 月 25 日

    (B)  中兴对退货产品或软件的检查清楚表明，缺陷不是由滥用、不当使用、维护、维修、安装、篡改或更改造成的；

这种选择仅适用于客户能够维持日常运营，不受有缺陷设备造成的干扰的情况。因有缺陷产品干扰日常运营的，中兴必须采取最直接的补救措施纠正问题。

中兴依据本保证条款维修或更换的任何设备、配件或部件须在客户预付运费和客户自担风险的情况下退回客户，并继续具有 12 个月的保证期。

本协议的产品和软件保证须视为从依据**附表 7 "验收测试程序"** 成功完成测试，客户将产品投入商业使用，或客户向中兴发出首次采购订单后一(1)年（前提是受保项目当时在客户网络内可合理执行预期功能）三者中任一情况首先发生时开始。

在保证期后对有缺陷部件的部件更换或维修，将按向客户出售的新组件的价格的合理百分值向客户定价，如本协议的定价协议所列。

中兴保证其安装、工程和培训服务将以良好熟练的方式执行，而且中兴供应的任何相关安装材料在工艺上不会存在任何重大缺陷。如上述服务完成之日起一年(1)内发现提供的服务有缺陷（在任何情况下，须在服务保证期内），并在发现后及时向中兴发出声称出现缺陷的书面通知，中兴须履行其保证，维修或更换任何安装材料和／或纠正安装错误。

若中兴与客户之间未签订包含协商条款、服务水平和价格的独立服务或维护协议，上述保证条文须构成中兴就有缺陷的产品、软件和／或安装服务承担的全部责任及客户在此方面的唯一权利和补救方法，不论索赔或补救是依据合同、侵权法或任何其他法律理论（包括但不限于疏忽、严格责任或其他）做出或寻求。

8



Case: 4:12-cv-01166-TIA   Doc. #: 53-1   Filed: 02/26/15   Page: 90 of 109 PageID #: 926

## ZTE 中兴
主供应协议版本日期 2006 年 9 月 25 日

不存在对适销性或特定用途的适用性的任何保证。不存在本协议所述条文以外的任何保证。除本协议明确列明者外，不存在任何明示或暗含的保证或对事实或陈述的确认。

**14.  可予宽宥的延迟**

凡因不可预见的干扰情况或非其所能控制的原因（包括但不限于天灾、任何政府行为、战争、暴乱、火灾、洪水、事故、罢工或禁运）造成中兴在本协议下延迟履约或未能根据本协议履约，中兴概不负责。若出现此等延迟，须按双方认为公平的额外期间延长时间表。

**15.  替换和修改**

中兴有权在交付或接受前（以较晚者为准）随时修改、更换或替换拟供应的产品或其制造的组件、从其供应商采购的材料及相关软件，但前提是这种修改、更换或替换不会对拟交付的特定产品和软件的操作要求、性能或维护产生不良影响，亦不会导致对客户额外收费。

**16.  许可证和牌照**

任何州、市政当局或其他政府机构要求的安装、提供或操作中兴提供的产品、软件或服务的任何许可证或牌照须由客户负责。中兴负责装运时符合美国政府或美国联邦通信委员会（FCC）的任何规定。中兴涉及在美国境外出口或转移产品和／或软件的任何报价、要约或销售须符合美国的出口管制法律，并以符合这些法律为条件，包括在法律要求的范围内由适当的美国政府部门或机构签发出口许可证。

在设备交付后为满足政府命令对软件或设备所做的任何修改将由中兴执行，按合理的价格计费，使中兴可在此服务上获得不超过 10% 的利润。

**17.  机密信息**

客户承认，其在协商本协议和／或中兴履行本协议期间，或其安装、操作和／或使用本协议下提供的产品和软件期间，



# ZTE 中兴　　　　　主供应协议版本日期 2006 年 9 月 25 日

其拥有或将拥有有价值的专有信息或商业秘密，反之亦然。客户和中兴明确同意，对所有此等专有信息和商业秘密严格保密，并采取所有合理必要的预防措施保护此等专有信息及商业秘密不向第三方披露，并不会将此等专有信息或商业秘密用于有违订单和本协议预期交易，或对中兴或客户不利的任何目的。专有信息包括但不限于明确指明或合理知悉属于专有、机密或公司私有的，以书面、图表或其他有形形式传达或口头传达的技术、工程、业务或财务信息或数据。所有产品规格、描述、计算机程序、流程图、图解、手册、图表、开发工具、设计文件、业务计划、业务执行方法及价格构成中兴和／或客户的专有信息。

但上述客户的保密限制及义务不可延伸适用于符合以下条件的任何专有信息：(1)已经为客户所知且在中兴披露之时未对信息的使用加以限制（可以经书面文件证明）；(2)根据本协议披露之时已为公众所知或普遍可获取；(3)变得为公众所知或普遍可获取（并非因披露之后客户的行为所致）；(4)向客户书面披露及提供，未受到真正有权做出限制的第三方所制；(5)客户未使用中兴的专有信息而自主开发（可以经书面文件证明）；或(6)法律要求予以发布（但仅限于向中兴事先发出书面通知，以使其有合理机会介入对其信息予以适当保护之后）。

双方理解，客户或中兴违背或违反相关保密限制及义务，将对中兴或客户造成难以补救的损害，中兴或客户据此有权通过禁令救济强制执行相关义务，和／或获得其他适当补救和救济，包括收回成本和律师费。本协议条文须在协议终止后继续有效。

## 18. 转让

未经中兴事先书面同意（该同意不得无故拒绝给予、受条件制约或延迟给予），客户不得转让本协议、任何采购订单、或其在本协议下的任何权利和义务。双方同意，客户可向在既定市场实质上购买或收购其全部资产的任何一方转让本协议，但如收购方未掌握客户的财务状况，中兴可要求合理的财务保证，包括对未偿余额或此等款项的付款提供担保的银行信用证。中兴可向任何联营组织转让任何采购订单及其在本协议下的权利和义务（或可委托履行其义务），而联营组织



Case: 4:12-cv-01166-TIA   Doc. #: 53-1   Filed: 02/26/15   Page: 92 of 109 PageID #: 928

# ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

须在所有方面始终受此等义务约束。双方理解，中兴自此将解除其就上述转让或委托的标的
事宜对客户承担的任何责任。在前述条文的规限下，采购订单和本协议条款及条件将使双方
的继承人、继任人、遗产管理人、遗嘱执行人和受让人受益，并对他们具约束力。

## 19. 侵权

中兴同意，在客户被控侵犯任何美国版权、专利或类似第三方知识产权的诉讼中，若涵盖或
声称涵盖由中兴设计和制造且采用中兴所提供形式的产品或软件，中兴将自费对此类诉讼进
行抗辩；对于上述任何诉讼的最终判决或判令中评定客户就此类侵权应付的所有款项，中兴
同意全部承担，前提是(a)中兴收到即时书面通知，对任何此类侵权索赔以及针对客户提起
或威胁提起的任何诉讼作出说明；及(b)在不损害客户继续按预期使用已提供或拟提供物料
的权利的原则下，中兴获授权通过其律师承担唯一抗辩责任，并获授权和解或了结任何诉讼。
在如此抗辩的任何诉讼中，倘产品或软件被判侵权、禁止再予使用，或者倘鉴于任何侵权索
赔，中兴认为应当判产品或软件侵权并禁止其使用，中兴可为客户取得上述产品或软件的继
续使用权，或改用未侵权的产品或软件、修改侵权产品或软件使之不再侵权，或者接受产品
或软件退货并退还客户为此支付的价格（减去就客户之前受益使用产品或软件以及产品或软
件损耗所做的合理调整）。

客户同意，倘侵权索赔是基于客户的要求或使用，而此类要求或使用在业内并不常见、不为
中兴所知，也不符合中兴就适当应用和使用中兴设计和制造或其在履行客户订单时供应的产
品或软件所发布的标准文件，则上述赔偿不适用于客户，而应引伸适用于中兴。

倘侵权或相关索赔涵盖的任何产品或软件确系中兴提供，但并非由其制造或创造，相关抗辩
和赔偿义务将不由中兴承担，而由产品或软件的制造商或创造者承担，承担额以所提供的赔
偿为限，而该赔偿须让与和转与客户。

## 20. 管辖法律和具约束力的仲裁

本协议受佛罗里达州法律（不适用法律冲突原则）管辖，本协议内容概不影响无法藉合同放
弃或予以限制的任何消费者法定权利。双方

11



# ZTE 中兴　　　　　　主供应协议版本日期 2006 年 9 月 25 日

明确放弃《联合国国际货物销售合同公约》的适用性。倘双方因本协议产生任何争议、索赔或纠纷，一方可向另一方发出争议书面通知。双方应首先尝试通过高层谈判方式（无律师在场），尽量在发出争议通知之日起的十五(15)个营业日内（"决议期"）真诚地解决争议或纠纷。谈判期间，双方的美国高级行政人员应当亲自会面一次，会面时间不少于四(4)时。双方无法在决议期内解决争议的，可于决议期结束后十(10)个营业日内展开仲裁程序，仲裁程序按美国仲裁协会（"AAA"）规定的国际仲裁规则，由其国际争议解决中心审理。仲裁地点设在佛罗里达州杰克逊维尔，仲裁语言为英语。本协议双方明确同意，仲裁员的任何命令或裁决为对双方具约束力的最终裁决，可由任何具司法管辖权的法院执行。除非另有书面约定，仲裁费须由双方平摊。

## 21. 责任限制

即使本协议另有相反规定，双方明确理解并同意，中兴概不负责因其履行或未能履行本协议所造成或产生，或因产品、软件和／或服务的任何故障、失灵、缺陷或瑕疵，或因产品、软件和／或服务的单独使用或与其他设备或软件配套使用或者无法单独使用与其他设备或软件配套使用或者任何其他原因造成的间接、特殊、附带或相应而生的损害（包括但不限于数据丢失、利润或收入损失），即使中兴已获悉有可能发生此类损失或损害亦然。

此外，在任何情况下，中兴概不就超出客户在本协议下所付买价的任何类型的损失或损害负责，无论此类损失或损害是基于何种赔偿法律理论或其他因由。

## 22. 市场占有条文

在客户根据本协议向中兴发出首次采购订单后的四(4)年内（"期间"），中兴或其继任人不太可能随时退出并放弃美国市场，一旦发生，中兴同意退还在上述期间内直至中兴退出市场之日客户根据本协议支付的所有款项。

12



**ZTE 中兴** _____ 主供应协议版本日期 2006 年 9 月 25 日

**23. 遵守法律**

各方同意遵守所有外国、联邦、州和当地政府机关的一切适用法律、命令和法规，包括一切适用的进出口法律法规。

**24. 标题**

本协议若干章节开头部分的标题仅为方便而设，标题本身及其顺序或位置并不影响本协议的诠释和解释。

**25. 可分割性**

倘本协议任何条文被裁定为无效、非法或不可强制执行，应将此类条文从本协议中分割出来，而其他条文仍具有十足效力及作用。

**26. 豁免**

任何一方于任何时候未要求另一方履行本协议任何条文，并不影响该方在随后任何时候要求履约的权利，而任何一方对另一方违反本协议任何条文的豁免，亦不得视作或认定为对该条文本身的放弃。本协议的豁免或责任解除，须由寻求使豁免或责任解除生效的一方获得另一方获授权代表的书面签署方属有效。

**27. 副本**

本协议可签立为一式多份，每份副本均须视作正本，所有副本共同构成一份协议。

**28. 完整协议-附表的修订**

本协议条文构成双方就产品销售、相关软件许可证和／或安装服务达成的全部条款、条件及协定，

# ZTE 中兴　　　　　　　主供应协议版本日期 2006 年 9 月 25 日

并取代客户采购订单任何部分所载的任何预先印制条文，此类条文一律不适用。未经中兴与客户双方的正式获授权代表书面述明及签署，对此类条款及条件的修改或修订概属无效。在双方一致同意下，可对所有附表予以修改，以添加可交付项并说明其他事项。



# ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

本协议由双方以其名称签署，特此为证。

**ZTE USA, Inc**
签署人：【签名】
姓名：Joey Jia

职务：总经理

**Daredevil Inc.dba ClearTalk**
签署人：【签名】
姓名：Eric Steinmann

职务：开发经理

15

Case: 4:12-cv-01166-TIA   Doc. #: 53-1   Filed: 02/26/15   Page: 97 of 109 PageID #: 933

# ZTE 中兴
主供应协议版本日期 2006 年 9 月 25 日

**附表 1**
**项目说明**

Cleartalk 将利用中兴所有的 IP CDMA 2000 平台在其圣路易斯 (Saint Louis) 市场提供 1x、EVDO REV A 数据以及语音服务。注：Cleartalk 将与中兴 CDMA 2000 平台一致的提供 DSX 设备、语音邮箱、预付子系统以及上述设备。中兴所有的 IP CDMA 2000 平台将初步确定大小，因此 Cleartalk 可支持 70,000 名语音用户，平均每月的使用时间为 2000 分钟。在验收测试后，自商业运行后，此服务功能将保证 2 年时间。



# ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

**附表 2**

**责任分担**

~~见附件 SOR~~

将和中兴为杰克逊维尔的 PTA-FLA 配置的一个【难以辨识】相同。

【签名】

## ZTE 中兴

主供应协议版本日期  2006  年  9 月  25 日

**附表 3**
**物料清单和交付日期（见附件）**

见附件 "Cleartalk ZTE Pricing final.xls"

**ZTE中兴**

日期 [难以辨识]
客户：Cleartalk
项目名称：圣路易斯

### Daredevil 圣路易斯 CDMA 项目价目表

| 编号 | 货物 | 数量 | 单价 ($) | 价格 | 交付日期 |
|---|---|---|---|---|---|
| | 主要设备 | | | | |
| | | | | | |
| 1 | CDMA 移动通信 BTS (AWS)-Cleartalk 验证的每个 BTS 的数量 | | | | |
| 1.1 | SDR AWS**** S222 室内 | 40 | $35,000 | $1,400,000 | |
| 1.2 | SDR AWS**** S222 室外 | 123 | $35,000 | $4,305,000 | |
| 1.3 | SDR AWS**** S222222 室外 | 16 | $50,000 | $800,000 | |
| | | 179 | | | |
| 2 | ** 备用电池**** | | | | |
| | S111111/S222222 站点的备用电池-室外/4 小时 | 16 | $2,278 | $36,448 | |
| | S111/S222 站点的备用电池-室外 | 163 | $1,846 | $300,898 | |
| | | | | | |
| 3 | * 服务（项目管理和核心设备的安装） | 1 | $149,000 | $149,000 | |
| | 项目管理 | | $50,000 | | |
| | 核心设备的安装 | | $49,000 | | |
| | 系统集成 | | $50,000 | | |
| 4 | OMM 监控子系统 | 1 | $1,120 | $1,120 | " |
| | 设备价格 CIF （美国**港口） | | | $6,992,466 | |
| | 折扣价 | | | $5,600,000 | |
| | | | | | |
| | 其他的核心技术 | | | | |
| 5 | PDSN | 1 | $92,868 | $92,868 | " |
| 6 | MGM 支持 120K 用户（2000 分钟） | 1 | $339,857 | $339,857 | |
| 7 | CDMA 移动通信 BSC 支持 120K 用户（2000 分钟） | 1 | $287,180 | $287,180 | |
| | 小计 | | | $718,905 | |
| | 折扣小计 | | | $600,000 | |
| | | | | | |
| 8 | SDR AWS*** S222 室外 | 10 | $32,000 | $3,200,000 | |

# ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

附表 4
规格

见附件

同 AWS 的杰克逊维尔的【难以辨识】。

# ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

**附表 5**
**价目表**

见附件【难以辨识】
附表 3

# ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

**附表 6**
**培训安排**

见附件

## ZTE 中兴

主供应协议版本日期 2006 年 9 月 25 日

### 附表 9

### 已提供的交换室设备

- • MSCe
- — 1 个服务器机柜：23.6"（宽）x 31.5"（深）
- — 1 个服务器机柜：23.6"（宽）x 37.4"（深）
- • HLRe
- — 1 个服务器机柜
- — 2 个服务器机柜
- • MGW
- — 1 个服务器机柜(+1)
- — 1 个服务器机柜
- • BSC
- — 1 个服务器机柜(+1)
- — 1 个服务器机柜
  - ◉ PDSN
  - ◉ SMSC
  - ◉ Voicemail（非中兴）
  - ◉ OTA
  - ◉ Prepaid（非中兴）
  - ◉ MMS
  - ◉ DSX/Transmission（非中兴）

添加显示交换机布局和电源及热要求的图纸，并将未来提供的机柜标注为未来。

参阅附件"交换机房间平面图和电源"

# ZTE 中兴        主供应协议版本日期 2006 年 9 月 25 日

### 附表 10
### 田纳西州市场预算价格

参阅附件 "Budgetary Price_Tenn.xls"

不适用

# ZTE 中兴         主供应协议版本日期 2006 年 9 月 25 日

附表 7
验收测试程序

见附件 "ACCEPTANCE TEST PROCEDURE-3GCN and BSS"
与之前中兴在佛罗里达杰克逊维尔 (Jacksonville, Florida) 部署所采用的程序相同

# ZTE 中兴 　　　　　　　　　　主供应协议版本日期 2006 年 9 月 25 日

## 附表 8

## 供应商融资协议

在为整个初始项目发出客户采购订单时必须向中兴支付 100,000 美元，其后按附表 3 规定及本协议进一步规定付款：

余下百分之九十（90%）将在三(3)年期限内支付，利率为伦敦银行间同业拆借美元利率（全年适用年初的伦敦银行间同业拆借美元利率）。违约利率及费用即为主供应协议**第 5 段"付款条件"**所述。负债的应计利息须于及从依据**附表 7"验收测试程序"**成功完成测试之日或客户充分运用产品的商业用途之日（以较早者为准）（"**开始日期**"）开始计算，或如网络当时已投入商业使用并以预期方式发挥合理功能，则于客户向中兴发出首次采购订单之日后一(1)年开始计算。根据附表 3 和 4，本协议一经签署，即构成首次采购订单。

客户的负债须以可转让本票证明，在贷款期限内从**开始日期**的下一个季度开始按季度分十二(12)笔等额款项偿还。

中兴将保留由售给客户的所有设备及其他产品的价款担保权益，直至客户拖欠中兴的未偿总负债偿清之时为止。中兴将应要求发还用担保权益购买的部分设备，以反映迄今为止就该负债做出的付款。

在附件 3 订明的时间，客户或其担保人同意向中兴支付 2,000,000 美元的定金，作为担保客户在供应商融资协议下到期应付及欠付中兴的所有款项的付款保证。双方理解，中兴进一步履行其在主供应协议下的义务的前提是收到该款项。双方同意按交易日期的现汇率将 2,000,000 美元兑换为人民币，并在接下来 3 年内或在本协议规定作为抵押的剩余期限内按中国银行利率(2.52%)累算利息，（如更低）其后本信贷款通将按美元清偿，利率为清偿日期的现汇率。如客户已依据本供应商融资协议履行其对中兴负有的还款义务，中兴即保证依据本协议条款全额退回本融通。2,000,000 美元应在收到第 50 个 BTS 的一周内交付。



**ZTE 中兴**　　　　　　　　　主供应协议版本日期 2006 年 9 月 25 日

签立主供应协议后，双方须尽快协商订立互相可接受的正式惯用融资协议，以及纳入及实施上述条文的附带文件。